**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 4, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
———————————————

RAYMOND L. ZISUMBO,

      Plaintiff - Appellant/Cross -
      Appellee,

v.

OGDEN REGIONAL MEDICAL
CENTER,

      Defendant - Appellee/Cross -
      Appellant.

Nos. 13-4179, 14-4014, 14-4019

———————————————

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 1:10-CV-00073-TS)**
———————————————

April Lynn Hollingsworth, Hollingsworth Law Office, Salt Lake City, Utah, for Plaintiff-Appellant.

Mark D. Tolman, (Michael Patrick O'Brien and J. Angus Edwards, with him on the briefs) Jones Waldo Holbrook & McDonough, P.C., Salt Lake City, Utah, for Defendant-Appellee.

———————————————

Before **KELLY**, **PHILLIPS**, and **MORITZ**, Circuit Judges.
———————————————

**MORITZ**, Circuit Judge.
———————————————

Within a month after Raymond Zisumbo complained to his supervisor at Ogden

Regional Medical Center (ORMC) about alleged race discrimination in the workplace,

ORMC investigated Zisumbo for submitting apparently fraudulent letters to his supervisor months earlier. After confirming that at least one of the letters was falsified, ORMC terminated Zisumbo's employment. Zisumbo sued ORMC for race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and for breach of the implied duty of good faith and fair dealing under Utah law. After years of litigation, procedural wrangling, and a previous appeal to this court, only Zisumbo's Title VII claims for unlawful termination remained to be tried to a jury. The jury found in favor of ORMC on Zisumbo's discrimination claim but in favor of Zisumbo on his retaliation claim.

In cross-appeals and a third parallel appeal, the parties raise numerous issues. Zisumbo challenges the district court's decisions denying his request to amend his complaint, granting ORMC summary judgment on his good faith and fair dealing claim, and denying in part his request for reinstatement, front pay, and back pay, as well as his request for attorneys' fees. ORMC appeals the denial of its renewed, post-trial motion for judgment as a matter of law, and the denial of its request to further reduce Zisumbo's Title VII remedies. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND

ORMC employed Zisumbo as a Computer Tomography (CT or CAT scan) Technician in its imaging department from March 2005 to October 2009. Before beginning work with ORMC, Zisumbo acknowledged through his signature on an employment application and on an employee handbook acknowledgment card that any job offer extended to him would be for at-will employment. Sometime after he

2

started at ORMC, Zisumbo also signed a form acknowledging his receipt of a copy of ORMC's Code of Conduct and his understanding of the mandatory nature of the policies contained therein.

After Zisumbo had worked for OMRC for approximately four years, Anthony Rodebush became his supervisor. About that time, Zisumbo sought a promotion to a vacant CT Coordinator position. In early August 2009, Rodebush became curious as to why Zisumbo was so eager to get the promotion. Rodebush asked Zisumbo if he was worried that he wouldn't be able to get a coordinator job elsewhere and whether he'd been fired from other jobs. Zisumbo responded by offering to produce letters from his previous employers proving he was not fired. Later that same day, Zisumbo gave Rodebush letters from the University of Utah Hospital and St. Mark's Hospital. Rodebush also received a letter from McKay Dee Hospital. Without reviewing the letters, Rodebush placed them in a file in his desk.

On September 15, 2009, Rodebush informed the CT department during a staff pizza party at which Zisumbo was present that Zisumbo was seeking the CT Coordinator position. Rodebush suggested that the CT staff's lack of confidence in Zisumbo's leadership ability was preventing Zisumbo from being promoted. Rodebush encouraged employees at the meeting to discuss examples of Zisumbo's shortcomings and to compare his abilities to those of another employee—the employee ultimately promoted to the CT Coordinator position. Later that day, Zisumbo accused Rodebush of treating Zisumbo differently than other employees because Zisumbo is Hispanic. Rodebush suggested Zisumbo discuss his concerns

3

with ORMC's director of human resources, Chris Bissenden. Zisumbo interpreted this suggestion as a threat because he felt Bissenden didn't like him.

Zisumbo didn't take his concerns to Bissenden. Instead, about a week after the pizza party, he filed a complaint with the Utah Antidiscrimination and Labor Division complaining of race discrimination and also contacted ORMC's ethics line complaining of race discrimination and unprofessional behavior. The ethics line report of Zisumbo's complaint, however, did not mention race discrimination; instead, it noted only that Zisumbo complained of unprofessional behavior by Rodebush and other staff.

Judd Taylor, ORMC's ethics compliance officer, investigated Zisumbo's ethics line complaint. In doing so, Taylor met privately with Rodebush but not Zisumbo. Instead, on October 1, 2009, Taylor met with both Rodebush and Zisumbo to discuss the complaint.

The next day, October 2, 2009, Rodebush and Bissenden gave Zisumbo a written warning for unrelated incidents occurring several months earlier. Less than a week later, on October 8, 2009, Taylor asked Rodebush about Zisumbo's allegations that his coworkers were spreading rumors that Zisumbo had been fired from previous jobs. This questioning spurred Rodebush to give Taylor the letters Zisumbo had given Rodebush approximately two months earlier when Rodebush questioned Zisumbo about whether he'd been fired from previous jobs.

Rodebush reviewed the three letters for the first time with Taylor on October 8, 2009, and the two men concluded the St. Mark's and McKay Dee letters appeared

4

to have been fabricated. Both letters employed an informal and unprofessional tone and neither appeared to have been prepared on official hospital letterhead. One letter was unsigned and the signature on the other contained only a first name.

However, neither Rodebush nor Taylor confronted Zisumbo about the letters' authenticity. Instead, they gave them to Bissenden and conveyed their concerns to her. Bissenden agreed the letters appeared suspicious, and she immediately began investigating their authenticity. St. Mark's human resource director confirmed that its human resource department had not issued Zisumbo's letter. Bissenden also unsuccessfully attempted to contact McKay Dee's human resource department that day.

Later that same day—October 8, 2009—Rodebush and Bissenden met with Zisumbo. Bissenden gave Zisumbo all three letters and discussed each of them with him. Rodebush advised Zisumbo that ORMC had confirmed that the St. Mark's letter was fraudulent and that ORMC was terminating Zisumbo's employment for dishonesty.

The next day, Bissenden confirmed that the McKay Dee letter had not been issued by that hospital's human resource department. That same day, Zisumbo's attorney contacted Bissenden, saying "they" had confirmed the authenticity of the St. Mark's letter and claiming "Ashley" at St. Mark's prepared the letter. Bissenden immediately contacted St. Mark's human resource department and spoke with Ashley Jorgensen. Ashley advised Bissenden that she had not written the letter because she was on maternity leave on the date the letter was written.

5

Zisumbo filed this action on May 12, 2010, alleging only a Title VII hostile work environment claim. Six months later, ORMC agreed to permit Zisumbo to amend his complaint to allege (1) Title VII race discrimination claims based on hostile work environment, failure to promote in 2007 and 2009, and discriminatory termination; (2) a Title VII retaliation claim asserting ORMC fired Zisumbo for complaining about race discrimination; and (3) a state law claim for breach of the duty of good faith and fair dealing based on Zisumbo's claim that ORMC violated its anti-discrimination policy.

Early in the litigation, the district court entered a stipulated scheduling order setting deadlines for joining parties (July 29, 2011), amending pleadings (September 29, 2011), and discovery (December 30, 2011). The parties agreed to multiple continuations of the discovery deadline, ultimately extending it to August 31, 2012. But they did not agree to extend the other deadlines.

Nearly two years into the litigation and four months after the September 29, 2011, deadline, Zisumbo again sought to amend his complaint—this time to add a claim of race discrimination under 42 U.S.C. § 1981. This amendment, if permitted, would have added Rodebush as a defendant and three new state-law claims. But the district court denied Zisumbo's motion to amend.

Undeterred, Zisumbo filed a new lawsuit in the same court alleging the same claims he unsuccessfully sought to add by amendment in this case, and he then moved to amend the complaint in this case to consolidate the two cases. After the district court dismissed the second action, Zisumbo withdrew his motion to

6

consolidate and appealed the dismissal of the second suit. We ultimately rejected Zisumbo's ill-conceived effort to end-run the district court's decision. *See Zisumbo v. Ogden Reg'l Med. Ctr.*, 536 F. App'x 832, 833 (10th Cir. 2013) (unpublished).

In the meantime, this case proceeded in the district court with that court eventually granting ORMC summary judgment on Zisumbo's good faith and fair dealing claim, hostile work environment claim and 2007 failure to promote claim. Displeased with this ruling, Zisumbo sought reconsideration of the district court's grant of summary judgment on his good faith and fair dealing claim. Alternatively, Zisumbo sought yet again to amend his complaint, this time to add a breach of contract claim. The district court denied reconsideration and again refused to permit Zisumbo to amend.

Zisumbo's remaining claims were tried to a jury. Midway through trial, Zisumbo dismissed his 2009 failure to promote claim, leaving only his discrimination and retaliation claims based on unlawful termination. The jury found against Zisumbo on his discriminatory termination claim but found in his favor on his retaliatory termination claim.

In the remedy phase, Zisumbo sought back pay up to trial, and reinstatement to his job or front pay for three years, for total damages of nearly $550,000. The district court awarded him only $65,228.04, concluding Zisumbo's post-employment guilty plea to the misdemeanor assault of his daughter curtailed his back pay and rendered him ineligible for reinstatement or front pay.

7

After the district court entered judgment, both parties sought attorneys' fees and ORMC renewed its motion for judgment as a matter of law on Zisumbo's retaliation claim. The district court denied ORMC's motion for judgment as a matter of law and granted in part both parties' motions for attorneys' fees, reducing Zisumbo's fee request by 40% to $93,212, based primarily on his limited success in this litigation.

## DISCUSSION

### I. The district court did not abuse its discretion in denying Zisumbo's motion for leave to file a second amended complaint.

Nearly two years after this litigation began and more than four months after the scheduling order's deadline for amending pleadings, Zisumbo sought to amend his complaint a second time. Specifically, he sought to add a race discrimination claim against ORMC and Rodebush under 42 U.S.C. § 1981 based on the same facts underlying his Title VII race discrimination claims. He also sought to add three state-law claims against ORMC based on information he discovered more than five months before the deadline for amending pleadings. The district court denied Zisumbo's motion for leave to amend, and Zisumbo appeals. We review the district court's decision for abuse of discretion. *Bylin v. Billings*, 568 F.3d 1224, 1229 (10th Cir. 2009).

The parties dispute whether Rule 15 or Rule 16 of the Federal Rules of Civil Procedure governs our consideration of this issue. Zisumbo urges application of Rule 15, which generally governs amendments to pleadings. ORMC, on the other hand,

8

argues that because Zisumbo's amendment would have effectively amended the scheduling order, Rule 16—which specifically governs amendments to scheduling orders—applies instead.

As relevant here, Rule 15 allows a party to amend a pleading only with the court's leave, which the "court should freely give . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). *See Bylin*, 568 F.3d at 1231; *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1205 n.4 (10th Cir. 2006). Rule 16(b)(4) is arguably more stringent than Rule 15, permitting scheduling order amendments "only for good cause and with the judge's consent . . . ." *See Bylin*, 568 F.3d at 1231. But we need not resolve this dispute because Zisumbo failed to provide any justification for his delay, and therefore he can't satisfy even Rule 15's more lenient standard.

The district court denied Zisumbo's motion to amend his complaint because Zisumbo failed to provide an adequate explanation for the motion's untimeliness. While lateness itself does not justify denying an amendment, "denial of leave to amend is appropriate 'when the party filing the motion has no adequate explanation for the delay.'" *Minter*, 451 F.3d at 1205, 1206 (quoting *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365-66 (10th Cir. 1993)); *see also Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274, 1285 (10th Cir. 2006) (holding that undue delay is an appropriate justification for denying leave to amend under Rule 15).

Zisumbo offers two primary explanations for his delay. First, he argues his lawyer did not realize until January 2012 that Zisumbo could assert a § 1981 claim, and that his lawyer's lack of knowledge justifies his delay in seeking to amend. But

9

we have previously held that such belated realizations do not justify granting an untimely motion to add new claims. *See Woolsey v. Marion Labs., Inc.*, 934 F.2d 1452, 1462 (10th Cir. 1991). Moreover, Zisumbo admits he possessed all of the facts necessary to assert his § 1981 claim when he filed his first amended complaint. *See Frank*, 3 F.3d at 1365 (listing "failure to cure deficiencies by amendments previously allowed" as a permissible justification for denying leave to amend).

Second, Zisumbo contends he first obtained information to support the state-law claims during discovery. But the record shows that Zisumbo possessed all of the facts necessary to assert his state-law claims by April 2011—five months before the deadline for amending his complaint. Given the lack of any adequate explanation for Zisumbo's delay in seeking permission to amend his complaint, we conclude the district court did not abuse its discretion in denying Zisumbo's motion for leave to file a second amended complaint. *See Woolsey*, 934 F.2d at 1462 (finding no abuse of discretion on similar facts).

II. **The district court did not err in granting ORMC's motion for summary judgment on Zisumbo's good faith and fair dealing claim.**

In his good faith and fair dealing claim, Zisumbo alleged that ORMC's written code of conduct created an implied contract that gave rise to a duty of good faith and fair dealing, which ORMC breached when it terminated his employment. ORMC moved for summary judgment on this claim, arguing it owed Zisumbo no duty of good faith and fair dealing because it disclaimed any contractual relationship with Zisumbo.

10

The district court granted summary judgment to ORMC after recharacterizing Zisumbo's claim as one for breach of contract. Specifically, the court reasoned that Zisumbo's response to ORMC's summary judgment motion suggested he was claiming that ORMC violated only those duties arising under the express terms of its code, rather than some implied duty arising outside its four corners. *See United States v. Basin Elec. Power Co-op.*, 248 F.3d 781, 796 (8th Cir. 2001) (explaining implied good-faith covenant has "nothing to do with the enforcement of terms actually negotiated") (internal quotation marks omitted). The district court then concluded that because Zisumbo had not pled a breach of contract claim, he could not rely on an alleged breach of contract to defeat ORMC's motion for summary judgment. The district court later denied Zisumbo's motion to reconsider and his motion for leave to amend his complaint to add a breach of contract claim. Zisumbo appeals all three decisions.

We review the district court's grant of summary judgment de novo, applying the same standard the district court applied and viewing the evidence in the light most favorable to the non-moving party, here Zisumbo. *McBride v. Peak Wellness Ctr., Inc.*, 688 F.3d 698, 703 (10th Cir. 2012). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review for abuse of discretion the district court's decisions denying Zisumbo's motion to reconsider and his motion for leave to amend. *See Bylin*, 568 F.3d at 1229; *Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1177 (10th Cir. 2005). Although we decline to follow the

11

district court's rationale, we affirm its conclusion because Zisumbo failed to show he had a contractual relationship with ORMC that could have given rise to a duty of good faith and fair dealing.

Under Utah law, which governs Zisumbo's good faith and fair dealing claim, an employee like Zisumbo who is "hired for an indefinite period is presumed to be an employee at will who can be terminated for any reason whatsoever so long as the termination does not violate a state or federal statute." *Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 1000 (Utah 1991). An employee may overcome this presumption by showing he had an express or implied employment contract modifying his at-will status. *See id.* at 1000-01; *see also Tomlinson v. NCR Corp.*, 345 P.3d 523, 527, 531 *reh'g denied* (Feb. 11, 2015) (noting Utah Supreme Court has "consistently rejected the notion of a free-standing implied covenant of good faith and fair dealing in the absence of a contract"). Zisumbo does not contend he had an express contract with ORMC. Instead, he argues only that ORMC assumed binding obligations to its employees by implied contract based on promises made in ORMC's code of conduct.

Whether an implied contract exists "turns on the objective manifestations of the parties' intent," which include "announced personnel policies" and "employment manuals." *Tomlinson*, 345 P.3d at 527 (internal quotation marks omitted); *accord Morton Thiokol*, 818 P.2d at 1000. Indeed, the Utah Supreme Court has consistently held that "an employer's internally adopted policies and procedures concerning discharge can be sufficient evidence to rebut the presumption of at-will employment and can, in effect, become part of the contractual relationship between the employer

12

and the employee." *Tomlinson*, 345 P.3d at 527, 531. But a "'clear and conspicuous disclaimer, as a matter of law, prevents employee manuals or other like material from being considered as implied-in-fact contract terms.'" *Id.* at 529 (quoting *Morton Thiokol*, 818 P.2d at 1003); *see also Cabaness v. Thomas*, 232 P.3d 486, 503 (Utah 2010) (noting that court retains power to decide whether, as a matter of law, a reasonable jury could find that an implied contract exists). The "employee has the burden of establishing the existence of an implied-in-fact contract provision" by showing that the parties actually agreed to be bound by the employee manual's terms. *Morton Thiokol*, 818 P.2d at 1001.

In his opening brief, Zisumbo fails to identify any specific provisions of ORMC's code of conduct that might create an enforceable obligation to ORMC's employees. On this basis alone, we could reject Zisumbo's challenge to the district court's resolution of his good faith and fair dealing claim. *See Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) (explaining that failure to cite legal authorities and portions of record on which appellant relies may result in forfeiture of argument on appeal).

Zisumbo's reply brief does point to a few code provisions that he asserts create enforceable obligations for ORMC. But even assuming the code contains provisions that could operate as contract provisions, Zisumbo's employment application and employee handbook acknowledgment card contained clear and conspicuous disclaimers that disclaim any contractual relationship that might otherwise have arisen.

13

Zisumbo's application stated that "any employee handbook . . . [would] not constitute an employment contract, but [would] be merely a gratuitous statement of facility policies." App. for Empl., Doc. 42-1 at 50 (capitalization and emphasis omitted). Zisumbo concedes this provision disclaimed any contractual relationship, but he contends it doesn't apply here because the code of conduct on which he relies is not an "employee handbook." But Zisumbo's argument ignores additional language in the application clarifying that an employee's at-will status could "only be altered by a written contract of employment" that was "specific as to all material terms and . . . signed by [the employee] and [ORMC's] Administrator." *Id.* Notably, the handbook acknowledgment card that Zisumbo signed repeated this limitation. Zisumbo does not argue that he and ORMC ever entered a written contract that would fall within this strict exception to employment-at-will.

Finally, although Zisumbo is correct in asserting that he signed ORMC's employment application and handbook acknowledgment card before receiving the code of conduct, Utah courts have indicated that disclaimers apply with equal force to future alleged agreements. *See Morton Thiokol*, 818 P.2d at 1003-04 (holding that in light of employee handbook's disclaimer, subsequent alleged agreements were "insufficient to raise a triable issue concerning a subsequent modification"). Therefore, we affirm the district court's grant of summary judgment in favor of ORMC on Zisumbo's good faith and fair dealing claim. *Tomlinson*, 345 P.3d at 530; *accord Morton Thiokol*, 818 P.2d at 1003; *Johnson v. City of Murray*, 909 F. Supp. 2d 1265, 1296-97 (D. Utah 2012), *aff'd* 544 F. App'x 801, 807 (10th Cir. 2013)

14

(unpublished). Having done so, we further conclude the district court did not abuse its discretion in denying Zisumbo's motion to reconsider and motion for leave to amend.

### III.  The district court did not err in denying ORMC's renewed motion for judgment as a matter of law on Zisumbo's retaliation claim.

In its cross-appeal, ORMC contends the district court erred in denying its renewed, post-trial motion for judgment as a matter of law on Zisumbo's retaliation claim. It contends that no reasonable jury could have found a causal connection between Zisumbo's complaints of discrimination and ORMC firing him, or found that ORMC's reason for firing Zisumbo was false. We review the district court's decision de novo. *McInnis v. Fairfield Communities, Inc.*, 458 F.3d 1129, 1136 (10th Cir. 2006).

Judgment as a matter of law "is warranted only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion. We do not weigh the evidence, pass on the credibility of the witnesses, or substitute our conclusions for those of the jury." *Id.* at 1136 (internal quotation marks omitted); *see also* Fed. R. Civ. P. 50(a). In other words, judgment as a matter of law is appropriate if, construing the evidence and all inferences in the light most favorable to the nonmoving party, "the court is certain the evidence conclusively favors [the moving] party such that" no reasonable jury could "arrive at a contrary verdict." *Weese v. Schukman*, 98 F.3d 542, 547 (10th Cir. 1996) (internal quotation marks omitted).

To prevail on a retaliatory discharge claim, a plaintiff must establish that the decision to terminate him resulted from retaliatory animus. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013) (holding that Title VII retaliation plaintiff must show "but-for" causation); *Baty v. Willamette Indus., Inc.*, 172 F.3d 1232, 1243 (10th Cir. 1999), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). Following a full trial on the merits, the question is whether the plaintiff presented sufficient evidence for the jury to find that adverse employment action was taken against him because he engaged in protected activity. *Baty*, 172 F.3d at 1243; *see also* 42 U.S.C. § 2000e-3(a). The plaintiff can ordinarily meet this burden "through the combination of a prima facie case and the presentation of 'sufficient evidence to find that the employer's asserted justification is false.'" *Stewart v. Adolph Coors Co.*, 217 F.3d 1285, 1288 (10th Cir. 2000) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

In a case for retaliation under Title VII, the plaintiff's prima facie case consists of showing (1) he engaged in protected opposition to discrimination; (2) he suffered an adverse action that a reasonable employee would have found material; and (3) there is a causal nexus between his opposition and the employer's adverse action. *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1086 (10th Cir. 2007); *see also Nassar*, 133 S. Ct. at 2533. Only the causal connection element is at issue here.

## A.    Causal Connection

To establish a causal connection between his complaints of race discrimination and his termination, Zisumbo must show (among other things) that the individuals or

16

individuals who decided to terminate his employment knew of his discrimination complaints when deciding to terminate him. *See Zokari v. Gates*, 561 F.3d 1076, 1081 (10th Cir. 2009) (stating plaintiff must show that "individuals who took adverse action against him knew of his protected opposition"); *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002) (noting that "employer's action against an employee cannot be *because* of that employee's protected opposition unless the employer knows the employee has engaged in *protected opposition*" (second emphasis added)). Aside from ORMC's asserted nondiscriminatory reason for firing Zisumbo, which we discuss below, this is the only aspect of causation that ORMC challenges. Specifically, ORMC contends that Bissenden alone made the decision to terminate Zisumbo and that she did not know he had complained of discrimination. Instead, ORMC contends Bissenden knew only that Zisumbo had complained to the ORMC ethics line regarding unprofessional behavior. But we need not consider whether Bissenden knew of Zisumbo's complaints of race discrimination because a reasonable jury could reject ORMC's underlying premise that Bissenden alone decided to terminate Zisumbo.

As ORMC suggests, the record does show that Bissenden testified she was the "sole person" who decided to terminate Zisumbo's employment and that Rodebush and Taylor didn't "have any part in the decision." Trial Tr., Doc. 238, at 101. But Bissenden also testified that generally she and "[t]he supervisor . . . make the [termination] decision together." Trial Tr., Doc. 235, at 48. Similarly, Rodebush testified he had authority to fire his employees and typically would "run those

17

decisions by" human resources. Trial Tr., Doc. 236, at 100. Taylor also testified that it was "common practice" at ORMC for department directors to hire and fire within their departments. Trial Tr., Doc. 237, at 26.

In addition to the tension between Bissenden's, Rodebush's, and Taylor's testimony, we are swayed by the memo Bissenden prepared documenting the details of their meeting with Zisumbo. The memo confirms, "Mr. Rodebush indicated to Mr. Zisumbo that *we* had officially verified that the St. Mark's letter was fraudulent and that he was dismissed from employment . . . for presenting the document to *us* as authentic." Bissenden Memo, Doc. 162-6 (emphasis added).

We have no hesitancy in concluding that together, the testimony and the memo would permit a reasonable jury to conclude that both Rodebush and Bissenden made the decision to terminate Zisumbo's employment. In so holding, we note that this is not a situation, as ORMC contends, of allowing the jury to both disregard discredited testimony and to rely on that testimony to reach a conclusion contrary to it. *See Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512 (1984) (noting that normally, "discredited testimony is not considered a sufficient basis for drawing a contrary conclusion"). Nor is this a case of speculative "must-have" and "could-have" assumptions. Rather, a reasonable jury could find that Rodebush, who had authority to terminate Zisumbo's employment, actually did so.

Having rejected the premise of ORMC's argument—that Bissenden was the sole decision-maker—the remainder of the causal connection inquiry is relatively straightforward. ORMC does not dispute that Rodebush knew of Zisumbo's

18

complaints of race discrimination, nor does it respond to Zisumbo's argument that if Rodebush jointly made the decision to fire Zisumbo, a reasonable jury could have found that a causal connection existed. Thus, we agree with the district court that, drawing all reasonable inferences in Zisumbo's favor, a reasonable jury could have found that the decision-maker knew of Zisumbo's complaints of race discrimination.

## B. Pretext

ORMC also contends the district court erred in denying its renewed, post-trial motion for judgment as a matter of law because no reasonable jury could have concluded that ORMC's stated reason for terminating Zisumbo's employment—providing fraudulent letters regarding previous employment—was false, i.e., pretextual. We disagree.

"A plaintiff may show pretext by demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)). Mere conjecture that the employer's explanation is pretext, however, is insufficient—as a matter of law—to show pretext. *See id.* The focus of a Title VII pretext analysis is on the decision-makers' motivation. *See Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1144 (10th Cir. 2009); *see also Nassar*, 133 S. Ct. at 2533.

19

Here, the timing of Zisumbo's termination supports an inference that ORMC terminated his employment because he complained about discrimination. *See Anderson*, 181 F.3d at 1179 (explaining that "retaliatory motive may be inferred when an adverse action closely follows protected activity"). Specifically, Zisumbo contends he complained about race discrimination to Rodebush, ORMC's ethics line, and the Utah Labor Commission in mid-September 2009. ORMC terminated his employment less than a month later on October 8, 2009. Although evidence of temporal proximity between the protected activity and the alleged adverse employment action alone is insufficient to show pretext, it can support a finding of pretext when combined with other evidence of pretext. *Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1293 (10th Cir. 2013); *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1213 (10th Cir. 2007). Zisumbo produced such evidence at trial.

For example, Zisumbo produced evidence demonstrating that ORMC did not fully investigate his ethics line complaint and complaint of race discrimination. Instead, that investigation quickly morphed into an investigation of Zisumbo's past actions and specifically focused on the letters Zisumbo had given Rodebush months earlier. Although Rodebush had possessed the letters for several months, he claimed he'd placed them in a desk drawer and never reviewed them until he showed them to ORMC's internal investigator, Taylor. Once the two men reviewed them together, they immediately suspected the letters were fraudulent, and they involved ORMC's human resources director, Bissenden. Then, contrary to Bissenden's usual procedure for investigating an employee suspected of falsifying information, Bissenden neither

20

fully determined the accuracy of the information contained in the letters nor investigated Zisumbo's intent in submitting them. Instead, once Bissenden verified that the St. Mark's letter did not come from St. Mark's, Rodebush and Bissenden terminated Zisumbo's employment.

Construing this evidence in the light most favorable to Zisumbo, a reasonable jury certainly could have believed that Zisumbo's abrupt termination—allegedly based on fraudulent letters that his supervisor had held for months and following closely on the heels of his complaints of race discrimination—was instead based on retaliation for Zisumbo's assertion of race discrimination. We thus affirm the district court's decision denying ORMC's renewed motion for judgment as a matter of law on Zisumbo's retaliation claim.

## IV. The district court did not err in denying Zisumbo's request for a punitive damages instruction.

Next, Zisumbo argues the district court erred by refusing to instruct the jury on punitive damages. Prior to trial, Zisumbo submitted a proposed instruction regarding punitive damages. The district court ultimately denied the request, finding Zisumbo had presented no evidence "of the type of corporate negligence [or] malfeasance that would" justify punitive damages. Trial Tr., Doc. 237, at 67. We review the district court's decision de novo. *See Fitzgerald v. Mountain States Tel. & Tel. Co.*, 68 F.3d 1257, 1262 (10th Cir. 1995).

A Title VII plaintiff is entitled to punitive damages if his employer engaged in discriminatory practices "with malice or with reckless indifference to [his] federally

21

protected rights." 42 U.S.C. § 1981a(b)(1). "Malice" and "reckless indifference" require proof the employer acted "in the face of a perceived risk that its actions [would] violate federal law." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535-36 (1999).

Because "agency principles limit vicarious liability for punitive awards," *id.* at 541, plaintiffs seeking punitive damages for a Title VII violation must overcome the additional hurdle of "imput[ing] liability for punitive damages to" the employer, *id.* at 539. An employee may not hold his employer "vicariously liable for the discriminatory employment decisions of managerial agents where the[] decisions [were] contrary to the employer's 'good-faith efforts to comply with Title VII.'" *Id.* at 545 (quoting *Kolstad v. Am. Dental Ass'n*, 139 F.3d 958, 974 (D.C. Cir. 1998) (Tatel, J., dissenting), *vacated*, 527 U.S. 526 (1999)).

Although "'*Kolstad* provides us no definitive standard for determining what constitutes good-faith compliance with' Title VII," we have held that *Kolstad*'s good-faith-compliance standard requires an employer to at least (1) adopt anti-discrimination policies, (2) make a good faith effort to educate its employees about these policies and Title VII's prohibitions, and (3) make good faith efforts to enforce an anti-discrimination policy. *Cadena v. Pacesetter Corp.*, 224 F.3d 1203, 1210 (10th Cir. 2000) (quoting *EEOC v. Wal-Mart Stores, Inc.*, 187 F.3d 1241, 1248 (10th Cir. 1999)); *see also Kolstad*, 527 U.S. at 545-46.

The focus of these inquiries is on the employer; Zisumbo must show that ORMC—not just its managerial employees—failed to make good-faith efforts to comply with Title VII. *Harsco Corp. v. Renner*, 475 F.3d 1179, 1189 (10th Cir. 2007). Because

22

ORMC "submitted substantial evidence showing that the company established comprehensive polic[i]es and training procedures in an effort to comply with Title VII," Zisumbo faces an uphill battle. *Harsco*, 475 F.3d at 1189. In addition to annually training its employees on its anti-discrimination policies, ORMC consistently investigated reports of discrimination and incorporated into every manager's or supervisor's performance evaluation their compliance with anti-discrimination policies.

Zisumbo concedes that ORMC adopted anti-discrimination policies, but he argues there is no evidence that ORMC actually adhered to those policies. In support, he contends that neither Taylor nor Bissenden adhered to ORMC's policies with respect to their investigation of his allegations of race discrimination despite the fact that Taylor received training on those policies and Bissenden wrote them. But we have rejected a similar argument, noting the inherent flaw in its rationale: "If failure of supervisors to comply with company policy were sufficient evidence to prove the lack of a good-faith effort to train, the *Kolstad* defense would be effectively eliminated." *Id.* at 1189. Moreover, although a reasonable jury could have found Taylor's and Bissenden's investigations in this case to be lacking, those failures don't establish a broader failure by ORMC to enforce anti-discrimination policies.

In suggesting he was entitled to a punitive damage instruction, Zisumbo relies on a trio of cases, each of which is distinguishable: *McInnis v. Fairfield Communities, Inc.*, 458 F.3d 1129, 1139 (10th Cir. 2006), *Cadena v. Pacesetter Corp.*, 224 F.3d 1203, 1212 (10th Cir. 2000), and *Knowlton v. Teltrust Phones, Inc.*, 189 F.3d 1177, 1186-87 (10th Cir. 1999).

23

Unlike the plaintiff-employee in *McInnis*, who repeatedly complained to upper-level management over a year-long period, Zisumbo complained only twice: once to his supervisor (Rodebush), and once to the ethics line. *See* 458 F.3d at 1139. And unlike the employer in *Cadena*, whose sexual harassment training was so lacking that a jury could find that the employer failed to educate its employees about its non-discrimination policies, ORMC presented more than sufficient evidence of its efforts to train its employees regarding its anti-discrimination policies. *See* 224 F.3d at 1212. Further, the facts here are unlike those before us in *Knowlton*, where the plaintiff proved pervasive sex discrimination that the company president knew about and permitted. *See* 189 F.3d at 1186-87.

Instead, the facts of this case more closely resemble those in *Harsco*, 475 F.3d at 1189-90, where this court upheld the district court's rejection of the plaintiff's request for a punitive damages instruction because she proved only that her supervisors failed to comply with the company's anti-discrimination policies. Here, although Taylor and Bissenden did not conduct their investigations consistently with ORMC's policies, their shortcomings cannot be imputed to ORMC without more. Indeed, in *McInnis* we noted that if a retaliating supervisor's knowledge of retaliation was automatically imputed to the employer, it could spell the end of the *Kolstad* defense. *McInnis*, 458 F.3d at 1139 n.7. Thus, we agree with the district court's decision that the evidence presented at trial did not, as a matter of law, support a finding that ORMC should be subject to punitive damages.

**V.** **The district court did not abuse its discretion in determining Zisumbo's back pay award, or in denying Zisumbo's request for front pay and/or reinstatement based on Zisumbo's post-employment assault conviction.**

After prevailing on his retaliation claim, Zisumbo sought Title VII remedies in the form of approximately $400,000 in back pay from his termination date, October 8, 2009, through September 1, 2013. He also sought reinstatement, or, alternatively, front pay for three years. But the district court substantially modified this request based on Zisumbo's September 15, 2010, conviction for misdemeanor assault of his daughter, which the court found constituted "egregious post-termination misconduct sufficient to curtail back pay and bar reinstatement or front pay." Mem. & Order, Doc. 191 at 21. The court thus limited Zisumbo's back pay to approximately $65,000, covering the period between Zisumbo's termination on October 8, 2009, and his conviction on September 15, 2010.

Zisumbo appeals, arguing the district court abused its discretion by limiting his back pay and denying him reinstatement and front pay based on post-termination misconduct. ORMC cross-appeals. It argues the district court abused its discretion by refusing to limit Zisumbo's back pay to the single day that elapsed between Zisumbo's termination on October 8, 2009, and ORMC's acquisition of new information on October 9, 2009, confirming its suspicions about the inauthenticity of the McKay Dee letter. And on the same date, ORMC alleges, additional misconduct regarding the St. Mark's letter occurred. We review the district court's rulings on back pay, reinstatement, and front pay for abuse of discretion. *Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 911 (10th Cir. 2004); *Abuan v. Level 3 Commc'ns, Inc.*, 353 F.3d 1158, 1176 (10th Cir. 2003).

## A.     Back Pay after October 9, 2009

District courts possess considerable discretion to devise appropriate remedies for Title VII violations. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 416-22 (1975); *Estate of Pitre v. W. Elec. Co.*, 975 F.2d 700, 704 (10th Cir. 1992). But the exercise of this discretion must be tied to Title VII's twin purposes of "provid[ing] an incentive to employers to avoid discriminatory practices" and "'making persons whole for injuries suffered on account of unlawful employment discrimination.'" *Estate of Pitre*, 975 F.2d at 704 (quoting *Albemarle*, 422 U.S. at 418).

Typically, back pay is calculated from the date of wrongful termination to the end of trial. *Wulf v. City of Wichita*, 883 F.2d 842, 871 n.37 (10th Cir. 1989). But an employee's back pay may be limited. For example, if an employer learns that the employee—while employed—committed "'wrongdoing . . . of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge,' the employee may . . . be denied backpay to which [he] would otherwise be entitled." *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 554 (10th Cir. 1999) (quoting *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 362-63 (1995)). Implicit in this rule is that at the time the employee was fired the employer was not aware of the information that it later claims would have provided an independent and legitimate reason for termination. *See Ricky v. Mapco, Inc.*, 50 F.3d 874, 875-76 (10th Cir. 1995) (acknowledging that employer must show it was unaware of allegations of misconduct when employee was terminated).

26

ORMC argues that on October 9, 2009—the day after it terminated Zisumbo's employment—it received two pieces of information that would have provided legitimate justifications for its decision to terminate Zisumbo: (1) confirmation the McKay Dee letter did not come from that hospital; and (2) a phone call from Zisumbo's lawyer stating "they" had validated the St. Mark's letter and that "Ashley" at St. Mark's wrote it, which according to Bissenden turned out to be false.

### 1. McKay Dee letter

At the time ORMC terminated Zisumbo's employment, Bissenden had not yet confirmed that the McKay Dee letter was fraudulent. But both Rodebush and Bissenden had inspected the letter and concluded it was suspicious, and based on that suspicion, they discussed it with Zisumbo before terminating his employment. The following day, Bissenden continued her investigation and confirmed that McKay Dee had not issued the letter. ORMC contends that Zisumbo's back pay should be limited to one day based on this confirmation of the letter's inauthenticity.

But the district court rejected this theory, finding that ORMC relied on the apparent inauthenticity of the McKay Dee letter as a reason for terminating Zisumbo's employment. The record supports the district court's finding. For instance, although Bissenden denied that her suspicions about the McKay Dee letter factored into Zisumbo's termination, Rodebush stated that the letters generally raised concerns about Zisumbo's honesty and that all three letters were discussed in the meeting. And Taylor testified that Zisumbo was "[t]erminated for falsifying some documents." Trial Tr., Doc. 236, at 175. Under these circumstances, Bissenden's

27

confirmation of the fraudulent nature of the McKay Dee letter was not after-acquired evidence limiting Zisumbo's entitlement to back pay, and the district court did not abuse its discretion in so finding. *See Ricky*, 50 F.3d at 875-76.

2. St. Mark's letter

ORMC contends it learned of additional evidence of misconduct when, on the day following Zisumbo's termination, October 9, 2009, Bissenden received a call from Zisumbo's attorney, who advised that "they" had confirmed the authenticity of the St. Mark's letter and that "Ashley" at St. Mark's prepared it. Bissenden immediately contacted the human resource department at St. Mark's and spoke with Ashley Jorgensen, who verified that she did not write the letter because she was on maternity leave on the date of the letter.

The district court found this evidence did not constitute after-acquired evidence limiting back pay for several reasons. Primarily, the district court concluded that even if the information provided by Ashley at St. Mark's revealed any additional deception, that deception could not be attributed to Zisumbo. We agree and conclude the district court did not abuse its discretion in making this finding.

**B.      Front Pay, Reinstatement, and Back Pay After September 15, 2010**

The district court curtailed Zisumbo's back pay and denied his requests for front pay and reinstatement based on Zisumbo's act of pleading guilty, on September 15, 2010, to assaulting his daughter. Zisumbo argues this was error.

Front pay is "money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement" to make the plaintiff whole.

*Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001); *accord McInnis*, 458 F.3d at 1145. "'Because determining a front pay award requires the district court to predict future events and consider many complicated and interlocking factors, we review such awards with considerable deference, reversing only for an abuse of discretion.'" *Abuan*, 353 F.3d at 1177 (quoting *Mason v. Okla. Tpk. Auth.*, 115 F.3d 1442, 1458 (10th Cir. 1997), *overruled on other grounds by TW Telecom Holdings Inc. v. Carolina Internet Ltd.*, 661 F.3d 495 (10th Cir. 2011)).

Like back pay, front pay and reinstatement may also be limited based on an employee's actions: "It would be both inequitable and pointless to order the reinstatement of someone the employer would have terminated, and will terminate, in any event and upon lawful grounds." *McKennon*, 513 U.S. at 362. Although *McKennon* dealt only with "after-acquired evidence of *pre-termination* wrongdoing," we have suggested that its "logic . . . may permit certain limitations on relief based on *post-termination* conduct" too. *Medlock*, 164 F.3d at 555 (citing Christine Neylon O'Brien, *The Law of After-Acquired Evidence in Employment Discrimination Cases: Clarification of the Employer's Burden, Remedial Guidance, and the Enigma of Post-Termination Misconduct*, 65 UMKC L. Rev. 159, 174 (1996) approvingly as "concluding that egregious post-termination misconduct should ordinarily bar reinstatement and curtail backpay").

Federal courts disagree regarding whether post-termination conduct can ever curtail an employee's right to front pay, reinstatement, or back pay. *See Jones v. Nissan N. Am., Inc.*, 438 F. App'x 388, 406-07 (6th Cir. 2011) (unpublished) (compiling cases). But we need not address that broader legal question here because

29

Zisumbo concedes on appeal that he "does not argue that back pay, front pay, and reinstatement may never be limited by evidence of post-termination misconduct." Zisumbo Resp./Reply Br. at 31 (internal quotation marks omitted).

Instead, Zisumbo asserts two narrower arguments: (1) that his post-termination misdemeanor conviction should not limit his right to front pay, reinstatement, or back pay because ORMC did not show that it would have terminated his employment because of the misdemeanor, and (2) the misdemeanor conviction should not limit his back pay because the misdemeanor directly resulted from his termination.

### 1. Termination for misdemeanor

First, Zisumbo argues that his post-termination misdemeanor conviction should not limit his right to front pay, reinstatement, or back pay because ORMC did not show that it would have terminated Zisumbo for the misdemeanor. Zisumbo reasons that if he had remained employed by ORMC, the hospital would not have known about his misdemeanor conviction and therefore would not have fired him for it. But under *McKennon*, "[o]nce an employer learns about employee wrongdoing that would lead to a legitimate discharge, we cannot require the employer to ignore the information, even if it is acquired during the course of discovery in a suit against the employer and even if the information might have gone undiscovered absent the suit." *McKennon,* 513 U.S. at 362.

Alternatively, Zisumbo argues that even if we assume ORMC would have learned of the misdemeanor conviction had he remained employed there, ORMC failed to prove that it would have terminated him for that conviction. In support of

30

this theory, Zisumbo points out that the record contains no evidence of ORMC terminating specific employees for misdemeanor convictions.

While we agree that the record contains no such specific examples, it contains ample evidence from which the district court could reasonably conclude that the hospital would terminate employees for misdemeanor convictions. For example, the evidence showed that ORMC conducts background checks on all employment applicants and has a written policy providing that employment applicants, including rehires, may be denied employment based on a felony or misdemeanor conviction. Importantly, the purpose of the background checks is to screen out applicants who may pose a safety risk to ORMC's patients. With only one exception—an applicant with a ten-year-old conviction for retail theft that the applicant disclosed—ORMC has disqualified applicants with a criminal conviction on their records. And although the policy does not address current employees, Bissenden testified that ORMC holds current employees to the same standards as employment applicants. Under these circumstances, we hold that the district court did not abuse its discretion in concluding that ORMC would have terminated Zisumbo's employment for the misdemeanor conviction.

### 2. Misdemeanor resulted from termination

Second, Zisumbo argues the misdemeanor conviction should not count against him because it resulted directly from his termination. *See Medlock*, 164 F.3d at 555. In support, Zisumbo points to his testimony that losing his job caused him mental distress, which in turn led to his treatment by a psychiatrist who prescribed the

31

Ambien he took the night of the assault. And, according to Zisumbo, an adverse reaction to Ambien caused him to assault his daughter. Zisumbo speculates that had he not lost his job at ORMC, the chain of events that led him to assault his daughter would never have occurred.

Critically, Zisumbo also testified that he began receiving treatment from a psychiatrist and taking Ambien *before* ORMC terminated his employment, thus undermining the causal connection between his termination and the assault. In that regard, the facts here are distinguishable from those in *Medlock*.

In *Medlock*, the plaintiff "touched and cursed at Defendant's counsel" at a post-termination unemployment compensation benefits hearing. *Id.* (internal quotation marks omitted). On appeal, the defendant argued the district court erred in refusing to instruct the jury that it could limit the plaintiff's damages if the defendant could show that the plaintiff's conduct at the hearing was so severe that the defendant would have terminated the plaintiff on that basis alone. We rejected the defendant's argument, pointing out that "[t]he alleged misconduct . . . occurred at a hearing occasioned by plaintiff's termination," and thus arose as a "direct result" of the retaliatory termination. *Id.*

Here, Zisumbo insists that his termination caused him to see a psychiatrist who prescribed Ambien, which in turn caused him to assault his daughter. We need not decide, however, whether such a string of events could ever be the direct result of a termination because Zisumbo admits he began seeing a psychiatrist and taking Ambien *before* ORMC terminated his employment. Even assuming his Ambien use

32

ultimately caused the assault, neither the assault nor the Ambien use were "occasioned by" or the "direct result" of the termination.

Viewing the record as a whole, we conclude the district court did not abuse its discretion in concluding that ORMC would have terminated Zisumbo for his misdemeanor conviction. Nor did the district court abuse its discretion in finding that Zisumbo's misdemeanor assault conviction did not directly result from his termination. We therefore affirm the district court's decision limiting Zisumbo's back pay to the period between his termination and his assault conviction.

### C.     Back Pay Calculation

Finally, Zisumbo argues the district court abused its discretion in calculating his back pay award. Zisumbo asked the district court to calculate his weekly wages based on his W-2, and then multiply that by the number of weeks of back pay. But the district court declined to do so based on testimony that Zisumbo's W-2 might have reflected a payout of all paid time off accrued by Zisumbo at the time of his termination. Instead, the district court based Zisumbo's back pay award on his hourly wage and ORMC's detailed calculations. We conclude the district court did not abuse its discretion by calculating Zisumbo's back pay based on his actual hourly rate.[1]

**VI.     The district court did not abuse its discretion in limiting Zisumbo's attorneys' fees based on his limited success.**

---

[1] Because we affirm the district court's limitation of Zisumbo's back pay based on his post-termination conduct, we need not reach ORMC's argument that Zisumbo failed to mitigate his damages.

33

Under 42 U.S.C. § 2000e-5(k), a district court may award reasonable attorneys' fees to the prevailing party in a Title VII case. It may also reduce a prevailing party's award based on redundant, excessive, or improperly billed hours, or based on the attorneys' limited success in the case. *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983). In determining whether a fee award is reasonable, courts must consider both whether the plaintiff's successful and unsuccessful claims were related and whether the plaintiff's overall level of success justifies a fee award based on the hours expended by plaintiff's counsel. *Flitton v. Primary Residential Mortg., Inc.*, 614 F.3d 1173, 1177 (10th Cir. 2010). "Because the district court 'is in a better position than an appellate court to determine the amount of effort expended and the value of the attorney's services,' we review an attorney's fee award for abuse of discretion." *Flitton, Inc.*, 614 F.3d at 1176 (quoting *Starrett v. Wadley*, 876 F.2d 808, 825 (10th Cir. 1989)).

The parties agreed that the lodestar—the total number of hours reasonably expended multiplied by a reasonable hourly rate—equaled $162,228.50. *Robinson v. City of Edmond*, 160 F.3d 1275, 1281 (10th Cir. 1998). The only question on appeal is whether the district court abused its discretion in reducing the lodestar based on Zisumbo's lack of success on certain claims. Specifically, the district court reduced the lodestar by three discrete amounts: (1) $2,750 expended on Zisumbo's unsuccessful motion to stay the proceedings while he pursued his first appeal in this case; (2) $4,125 spent on Zisumbo's unsuccessful motion to reconsider the district court's grant of summary judgment on his good faith and fair dealing claim; and (3)

34

40% of the requested lodestar (or $64,891.40) based on Zisumbo's lack of success on his discrimination and good faith and fair dealing claims.

The district court denied attorneys' fees for the motion to stay because the motion was unsuccessful and unrelated to Zisumbo's retaliation claim. Zisumbo filed the motion for stay to buy time while he appealed to this court from the dismissal of his second lawsuit, which alleged § 1981 and state-law claims that the district court refused to permit him to add to his complaint in this case. We characterized Zisumbo's attempt to bring the new claims in a second suit as an "evasive claims-splitting maneuver" and noted it was not the "equitable and legally prescribed route for seeking to" add claims to this suit. *Zisumbo v. Ogden Reg'l Med. Ctr.*, 536 F. App'x 832, 833 (10th Cir. 2013) (unpublished). Under these circumstances, we hold the district court did not abuse its discretion in denying Zisumbo attorneys' fees related to his motion to stay the district court proceedings while he pursued this litigation maneuver.

Nor did the district court abuse its discretion by denying attorneys' fees for Zisumbo's motion to reconsider in which Zisumbo simply restated arguments the district court had already rejected on summary judgment. The motion was redundant and an inappropriate method of seeking relief from the district court's order. *See Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).

Finally, the district court reduced the lodestar amount by 40% because Zisumbo succeeded only on his retaliation claim. His discrimination claim, including at least four separate race-discrimination theories, and his good faith and fair dealing

claims all failed. The district court also considered the time and money spent litigating Zisumbo's two untimely motions for leave to amend his complaint.

District courts possess broad discretion in setting an attorneys' fee award. *Flitton*, 614 F.3d at 1176. While "[t]here is no precise rule or formula for making these determinations," *Hensley*, 461 U.S. at 436, "'[t]he record ought to assure us that the district court did not "eyeball" the fee request and cut it down by an arbitrary percentage,'" *Robinson*, 160 F.3d at 1281 (quoting *People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 90 F.3d 1307, 1314 (7th Cir. 1996)). *See also Hensley*, 461 U.S. at 436-37, 440 (noting that a district court "may simply reduce the award to account for the limited success" but must provide concise and clear explanation of its reasons for fee award; emphasizing reduced fee award is appropriate if relief is limited in comparison to the scope of the litigation as a whole).

Here, the district court's reasons for reducing Zisumbo's attorneys' fee award by 40%—Zisumbo's limited success overall and the generally haphazard manner in which his counsel litigated this case—were both appropriate and supported by the record. We find no abuse of discretion in the district court's attorneys' fee award.

## CONCLUSION

For the reasons stated above, we affirm.