**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 22, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

PHL VARIABLE INSURANCE
COMPANY,

      Plaintiff - Appellee,

v.

THE SHELDON HATHAWAY FAMILY
INSURANCE TRUST, by and through its
trustee, DAVID HATHAWAY,

      Defendant - Appellant,

and

WINDSOR SECURITIES, LLC,

      Intervenor Defendant - Appellant.

Nos. 15-4028 & 15-4029

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:10-CV-00067-RJS)**
_____

Alexander Dushku, Kirton McConkie, Salt Lake City, Utah (R. Willis Orton, R. Shawn
Gunnarson, and Shawn T. Richards, Kirton McConkie, Salt Lake City, Utah, and David
W. Scofield, Peters Scofield, Sandy, Utah, with him on the briefs), for Appellants.

David T. McDowell, Edison, McDowell & Hetherington, LLP, Houston, Texas (Thomas
F. A. Hetherington, Jessica L. Wilson, and Andrew R. Kasner, Edison, McDowell &
Hetherington, LLP, Houston, Texas, on the brief), for Appellee.

_____

Before **MATHESON**, **BALDOCK**, and **MORITZ**, Circuit Judges.

_____

**MORITZ**, Circuit Judge.

_____

Sheldon Hathaway became embroiled in a stranger-originated-life-insurance (STOLI) scheme at the behest of his neighbor, Jay Sullivan. A STOLI scheme typically works something like this: An elderly individual authorizes a speculator to take out a policy on his or her life. The speculator pays the policy premiums and then profits from its investment—either by collecting the policy payout when the insured dies, or by selling the policy to another speculator before that happens. *See Sciarretta v. Lincoln Nat'l Life Ins. Co.*, 778 F.3d 1205, 1208 (11th Cir. 2015) (describing "purest form" of STOLI scheme).

Here, Intervenor Defendant-Appellant Windsor Securities, LLC (Windsor) took a more roundabout approach to "gambling on the lives of the elderly," *see id.*: it loaned Defendant-Appellant the Sheldon Hathaway Family Trust (the Trust) $200,000 to finance the initial premium on a life insurance policy (the policy) for Hathaway. Windsor, it turns out, "has made a handful" of these premium-financing loans to insurance trusts in the past. Aplt. Br. 11. In exchange, Windsor "receives a moderate return on [its] investment" if a trust repays the loan. *Id.* Alternatively, Windsor "foreclose[s] on the life insurance policy that was pledged as collateral" when a trust fails to do so. *Id.* at 11-12. That's what happened here.

But before Windsor could profit from its investment—either by selling the policy or by capitalizing on Hathaway's death—Plaintiff-Appellee PHL Variable

Insurance Company (PHL) sought to rescind the policy based on alleged misrepresentations in Hathaway's insurance application (the application). The district court ultimately granted PHL's motion for summary judgment on its rescission claim. And it allowed PHL to retain the premiums Windsor already paid.

On appeal, Windsor and the Trust (collectively, the defendants) argue the district court erred in granting PHL's motion for summary judgment because there is at least a genuine dispute of material fact as to whether PHL waived its right to rescind the policy. Alternatively, they argue the district court erred in granting summary judgment because, at a minimum, a genuine dispute of material fact exists as to (1) whether the application contained a misrepresentation; and (2) whether PHL relied on that misrepresentation in issuing the policy. Finally, even assuming summary judgment was appropriate, they argue the district court lacked authority to allow PHL to retain the paid premiums.

We conclude no genuine dispute of material fact exists as to whether PHL waived its right to rescind the policy. Nor is there any genuine dispute of material fact as to whether the application contained a misrepresentation or whether PHL relied on that misrepresentation in issuing the policy. Finally, we hold the district court had authority to allow PHL to retain the paid premiums. Accordingly, we affirm.

BACKGROUND

Over the course of two or three years, Jay Sullivan approached his neighbor Sheldon Hathaway on several different occasions and spoke with him about purchasing life insurance from Sullivan. Sullivan assured Hathaway that an outside investor would finance the policy at no cost to Hathaway, and that Hathaway would receive $300,000 when the initial investor sold the policy after two years.

To assist Hathaway in completing the insurance application, Sullivan told Hathaway that he believed Hathaway's net worth was approximately $4,000,000. Hathaway knew that figure was inflated, but nevertheless acquiesced to his neighbor's calculations. The final signed version of the application listed Hathaway's net worth as $6,250,000.

Through a series of intermediaries, including Gabriel Giordano and Crump Life Insurance Services, Inc. (Crump), the application eventually reached PHL. PHL then sought confirmation of Hathaway's net worth from Infolink, a third-party service that verified the calculations in the application, ostensibly based on a conversation with Hathaway. Later, PHL would learn Infolink never contacted Hathaway.

In the meantime, Sullivan assisted the Trustee—Hathaway's son, David—in obtaining the initial $200,000 premium payment from a San Diego law firm that Windsor later reimbursed, and PHL issued the policy to Hathaway on January 31, 2008. But later that year, PHL became suspicious of Giordano and began an internal investigation into the policies he originated. As a result of that investigation, PHL

4

sent Hathaway a letter on May 5, 2009, requesting additional information about certain representations in the application and warning that failure to provide that information might lead to rescission of the policy. When Hathaway didn't respond, PHL filed suit to rescind the policy on January 28, 2010. The district court granted summary judgment in favor of PHL, and authorized it to keep the premiums. Windsor appealed.

## DISCUSSION

We review the district court's decision to grant summary judgment de novo, applying the same legal standard as the district court and viewing the evidence in the light most favorable to the non-moving party. *Zisumbo v. Ogden Reg'l Med. Ctr.*, 801 F.3d 1185, 1196 (10th Cir. 2015). "Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

## I.      Waiver

The defendants first argue the district court erred in granting PHL summary judgment on its rescission claim because PHL waived its right to rescind the policy. In support of this assertion, the defendants offer four separate—albeit related— waiver theories.

### A.      Statutory Waiver

First, the defendants argue PHL waived its right to rescind by failing to timely notify Hathaway that PHL had acquired knowledge of facts that would allow it to

5

rescind the policy. *See* Utah Code Ann. § 31A-21-105(5)[1] (noting that if an "insurer acquires knowledge of sufficient facts to constitute a general defense to all claims under [a] policy, the defense is only available if the insurer notifies the insured within 60 days after acquiring the knowledge of its intention to defend against a claim if one should arise"). According to the defendants, PHL acquired the requisite knowledge no later than December 31, 2008. By then, the defendants assert, "PHL knew that the [a]pplication contained inaccuracies that could support 'a general defense to all claims under the policy.'" Aplt. Br. 26 (quoting § 31A-21-105(5)). Thus, they conclude, in order to satisfy § 31A-21-105(5)'s 60-day notice requirement, PHL had to notify Hathaway no later than March 1, 2009, of its "intention to defend against a claim if one should arise." *Id.* (quoting § 31A-21-105(5)). And by failing to do so, the defendants argue, PHL waived its right to rescind the policy.

PHL disagrees. It maintains that failure to comply with § 31A-21-105(5)'s 60-day notice requirement only precludes an insurer from asserting a defense to an insured's claim, not from rescinding a policy under which a claim never actually arises. *See* § 31A-21-105(5) (stating *defense* is unavailable if insurer fails to comply with notice requirement, and explaining that insurer only "acquire[s] knowledge" for purposes of waiver provision if that knowledge "was disclosed . . . in connection with communications or investigations associated with the insurance policy under which the subject *claim arises*" (emphasis added)). Here, PHL points out, (1) no claim ever

---

[1] The parties agree that Utah law controls in this diversity action.

arose under the policy, and (2) PHL never asserted a defense to that non-existent claim. Accordingly, PHL insists, § 31A-21-105(5)'s 60-day notice requirement doesn't apply to PHL's efforts to rescind the policy.

We need not resolve this dispute. Even assuming § 31A-21-105(5) applies to an insurer's attempts to rescind a policy, the defendants' argument that the statute required PHL to provide notice by March 1, 2009, is viable only if they presented evidence from which a reasonable jury could conclude that PHL "acquire[d] knowledge of sufficient facts to constitute a general defense to all claims" by December 31, 2008. *Id.* For the reasons discussed below, we conclude the defendants fail to demonstrate a genuine dispute on this point.

First, the defendants point out that PHL admitted it "learned of the misrepresentations [in the application] during an investigation."[2] Aplt. Sealed App. vol. 7, at 444. The defendants' opening brief then directs us to pages 207-08 of the sealed appendix.[3] While those two pages of the record contain eight pages of

---

[2] Via the order issued on June 30, 2015, questions related to the permanent sealing of the appendix were referred to this panel, and our order dated April 11, 2016, addresses those issues. To the extent we quote from the portions of the appendix that our April 11, 2016 order allows to remain under seal, we have determined the quoted material is not sensitive.

[3] The defendants' original opening brief actually cited pages 209-10 of the sealed appendix. But at oral argument, counsel for the defendants informed us that the brief contained several citation errors. And after oral argument, the defendants moved for permission to file a corrected opening brief, asserting that "[v]irtually all" of the citation errors in the original opening brief "consist[ed] of a two-page discrepancy between the citation in the brief" and the correct citation. Mot. to File Corrected Br. at 2. While we disagree with counsel's assertion that "[v]irtually all" of the citation errors amount to 2-page discrepancies, *id.*, we nevertheless granted the

deposition testimony, the defendants point us to only one other specific statement that appears there: PHL's "investigation culminated with regard to [its] law department in December of 2008." Aplt. Br. 26 (quoting Aplt. Sealed App. vol. 4, at 207). Although the defendants don't explicitly state as much, they seem to suggest these two statements, taken together, establish that PHL "learned of the misrepresentations" in the application sometime "in December of 2008." Aplt. Sealed App. vol. 4, at 207; Aplt. Sealed App. vol. 7, at 444. And although "no precise date appears in the record," they reason, that means PHL acquired the requisite facts no later than December 31, 2008. Aplt. Br. 26.

But even viewed in the light most favorable to the defendants, the second of these two statements establishes only that PHL's "investigation culminated with regard to [its] *law department*" no later than December 31, 2008. Aplt. Sealed App. vol. 4, at 207 (emphasis added). It doesn't establish that PHL's *entire* investigation culminated no later than that date. And even though we assume that PHL learned of the misrepresentations at some point during its investigation, the fact that PHL's law department culminated *its* portion of the investigation by December 31, 2008, doesn't establish that PHL learned of the misrepresentations by that date; the defendants fail to identify any specific evidence that suggests the culmination of *the law department's* investigation marked the end of PHL's *entire* investigation. Thus, we conclude the only two specific statements that the defendants identify are insufficient

defendants' motion. Accordingly, all of our citations to "Aplt. Br." refer to the corrected brief filed on February 5, 2016.

to create a genuine dispute as to whether PHL "learned of the misrepresentations" by December 31, 2008. Aplt. Sealed App. vol. 7, at 244.

### B. Course-of-Conduct Waiver

The defendants' next two waiver arguments suffer from the same defect. First, the defendants argue PHL waived its right to rescind the policy by continuing to accept premium payments after it learned the application contained inaccuracies. *See Cont'l Ins. Co. v. Kingston*, 114 P.3d 1158, 1162 (Utah Ct. App. 2005) ("[A]n insurer waives the right to rescind an insurance policy when that insurer has knowledge of facts that would give it the right to rescind the policy" but nevertheless "treats the policy as valid, such as by earning and collecting premiums."). Second, the defendants assert that PHL waived its right to rescind by failing to promptly seek rescission after it learned the application contained inaccuracies. *See Farrington v. Granite State Fire Ins. Co. of Portsmouth*, 232 P.2d 754, 758 (Utah 1951) (stating in dicta that "[o]ne who claims a right of rescission must act with reasonable promptness" after obtaining knowledge that would give it a right to rescind). But to support these arguments, the defendants again rely solely on their assertion that PHL knew about the inaccuracies in the application no later than December 31, 2008. And for the reasons discussed above, we conclude the defendants fail to demonstrate there is a genuine dispute with respect to that issue.

### C. Agency Waiver

Finally, the defendants insist that we must impute knowledge of the inaccuracies contained in the application to PHL because, according to the

9

defendants, at least one of PHL's own agents was responsible for inserting the inaccuracies into the application in the first place. The district court rejected this argument, concluding that neither Crump nor Giordano were PHL's "agents" for imputation purposes. The defendants assert the district court committed a legal error in reaching this conclusion. We disagree.

First, we decline to address the defendants' argument that Crump and Giordano are PHL's agents as a matter of law under Utah Code Ann. § 31A-1-301(92). Defendants didn't advance this argument below. Nor do they argue for plain error review on appeal. That "marks the end of the road" for their § 31A-1-301(92) argument. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1131 (10th Cir. 2011).

Instead, we focus on the defendants' common-law agency argument, and ask only whether the defendants identify any evidence from which a reasonable jury could conclude Crump and Giordano (1) had actual or apparent authority to act on PHL's behalf and (2) were subject to PHL's control. *See Gildea v. Guardian Title Co. of Utah*, 970 P.2d 1265, 1269 (Utah 1998) ("To be an agent, a person must be authorized by another to 'act on his behalf and subject to his control.'" (quoting Restatement (Second) of Agency § 1 (1958))); *Zions First Nat'l Bank v. Clark Clinic Corp.*, 762 P.2d 1090, 1094 (Utah 1988) (explaining authority to act on entity's behalf may be actual or apparent).

Again, we find the defendants' briefing on this point to be wholly insufficient. The defendants nakedly assert that "[w]hether the tangle of overlapping contractual, financial, and working relationships between PHL, Crump, and Giordano created

10

actual or apparent agency is a question of fact that requires examination of 'all the facts and circumstances in the case.'" Aplt. Br. 35 (quoting *Vina v. Jefferson Ins. Co. of N.Y.*, 761 P.2d 581, 585 (Utah Ct. App. 1988)). But the defendants don't identify any *particular* facts or circumstances that might demonstrate the existence of an agency relationship, let alone provide citations to the record where that evidence appears. *See* Fed. R. App. P. 28(a)(8)(A) (requiring argument section of appellant's brief to contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"). We decline to "scour the record" for such evidence on the defendants' behalf. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

Because the defendants fail to point to any specific evidence that would allow a reasonable jury to conclude PHL waived its right to rescind the policy, we decline to reverse on this basis or on any of the waiver theories.

## II. Rescission

Even assuming the district court correctly rejected their waiver arguments, the defendants insist the district court erred in granting PHL's motion for summary judgment on its rescission claim. Under Utah Code Ann. § 31A-21-105(2), an insurer may rescind a policy only if it "relie[d] on a material misrepresentation made by the applicant." *Derbidge v. Mut. Protective Ins. Co.*, 963 P.2d 788, 791 (Utah Ct. App.

11

1998). Here, the defendants argue, there is a dispute as to (1) whether the application contained a misrepresentation; and (2) if so, whether PHL relied on it.[4]

### A.    Misrepresentation

For purposes of § 31A-21-105(2), "[a] misrepresentation occurs if the applicant knows or should have known about a misstatement in the application and still presents it to the insurer." *ClearOne Commc'ns, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 494 F.3d 1238, 1247-48 (10th Cir. 2007). Here, the parties agree the application contains a material misstatement about Hathaway's net worth. But the defendants argue the district court erred in concluding Hathaway[5] knew or should have known about it.

In concluding Hathaway knew or should have known about the misstatement, the district court relied on Hathaway's deposition testimony. In his deposition, Hathaway was asked whether he responded, "I'm not worth $4 million," when Sullivan suggested that Hathaway's net worth was $4 million. Aplt. Sealed App. vol. 5, at 273. Hathaway replied, "That's what I asked. I says, [Sullivan], what are you talking about? And [Sullivan] says, Well, he says, according to – according to all the

---

[4] The defendants insist that PHL must prove each element of its rescission claim by clear and convincing evidence. We need not evaluate this argument. For the reasons discussed below, we conclude that even assuming that evidentiary standard applies, PHL has satisfied it.

[5] PHL argues that even if Hathaway didn't know about the misstatement, his son—the Trustee—knew or should have known about it when he signed the application. The defendants respond that the Trustee's knowledge is irrelevant. What matters, they insist, is the *applicant's* knowledge. We need not resolve this dispute. Even assuming the defendants are correct, the district court accurately concluded that the uncontroverted evidence showed Hathaway himself should have known the application contained a misstatement.

12

neighbors and the way the property's going out here, if it was sold and put into lots, you'd – you'd be worth that much money." *Id.* Hathaway was then asked, "You didn't believe that, did you?" He responded, "No, I didn't, but I – I'm – well, what do you do when you got your friend trying to talk you into something that you – you need, some life insurance?" *Id.*

This exchange notwithstanding, the defendants argue the evidence suggests the application didn't contain *any* information about Hathaway's net worth when Hathaway signed it. Thus, they insist, "there is no evidence [Hathaway] even knew about the existence of *any* statements in the [a]pplication, true or false," about his net worth. Aplt. Br. 44.

But even assuming Hathaway didn't know the application misstated his net worth because it was blank when he signed it, there can be no doubt that he *should have* known. The defendants argue that because Hathaway objected when Sullivan suggested he was worth $4 million, Hathaway "had no reason to suspect that Sullivan . . . would insert [an inflated figure in the application] anyway." Aplt. Br. 46. But while Hathaway *initially* questioned Sullivan's calculations, the defendants point to no evidence suggesting Hathaway *continued* to protest after Sullivan explained his basis for them. Instead, Hathaway testified that he still didn't believe he was worth that much, "*but* . . . well, what do you do when you got your friend trying to talk you into something that you – you need, some life insurance?" Aplt. Sealed App. vol. 5, at 273 (emphasis added). This testimony establishes Hathaway *acquiesced* to Sullivan's calculations, despite knowing of their inaccuracy. Thus,

13

even viewing the facts in the light most favorable to the defendants, Hathaway should have known the application contained a misstatement about his net worth.

## B.    Reliance

The district court found PHL relied on this misrepresentation because, if the application had accurately characterized Hathaway's net worth, PHL wouldn't have issued a $4 million policy. The defendants' objection to this ruling is two-fold. First, the defendants insist that PHL actually relied on Infolink's report *verifying* the misrepresentation, not on the misrepresentation itself. Defendants seem to suggest that if PHL didn't rely *solely* on the misrepresentation, then PHL cannot satisfy the elements of § 31A-21-105(2). Because Windsor provides no argument or authority to support this suggestion, we decline to consider it. *See* Fed. R. App. P. 28(a)(8)(A); *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) (explaining we routinely decline to consider inadequately briefed arguments).

Second, even assuming PHL relied on the misrepresentation, the defendants argue that such reliance was unreasonable because (1) PHL chose to make an independent inquiry into Hathaway's net worth, and (2) a reasonable inquiry would have uncovered Hathaway's misrepresentation, but (3) PHL didn't discover the misrepresentation because its independent inquiry was "cursory." *See Hardy v. Prudential Ins. Co. of Am.*, 763 P.2d 761, 770 (Utah 1988) (explaining that such a showing precludes insurer from escaping liability on policy despite insured's material misrepresentations). According to the defendants, "PHL chose to conduct an independent inquiry through Infolink that was so 'cursory' it failed even to ask

14

Hathaway about the details of his [p]olicy. Had it done so, there is every reason to believe . . . that Hathaway would have answered truthfully about all the misstatements." Aplt. Br. 54.[6]

At the outset, we reject the defendants' assertion that "PHL *chose* to conduct an independent inquiry" that didn't even bother to ask Hathaway if the statements in the application were true. *Id.* (emphasis added). This accusation suggests PHL affirmatively directed Infolink to avoid contacting Hathaway, or, at the very least, that PHL knew or should have known that Infolink didn't actually contact Hathaway. But the defendants fail to point to any evidence in the record that might support this accusation. Instead, the evidence suggests only that PHL obtained an Inspection Report from Infolink, and that the Inspection Report indicated Infolink spoke with Hathaway, who verified the information contained in the application. Because the defendants provide neither argument nor authority to support their suggestion that it was unreasonable for PHL to accept the contents of the Inspection Report as true, we decline to address that possibility. *See* Fed. R. App. P. 28(a)(8)(A); *Bronson*, 500 F.3d at 1104.

Alternatively, even assuming PHL acted reasonably in accepting Infolink's representation that it spoke with Hathaway to verify the information in the application, the defendants argue that a reasonable jury could nevertheless conclude

---

[6] Although the Inspection Report reflects that Infolink verified the information in the application by speaking with Hathaway, Hathaway denied that Infolink ever contacted him. Because we view the evidence in the light most favorable to the defendants, *see Zisumbo*, 801 F.3d at 1196, we assume Infolink never contacted Hathaway.

15

that merely asking Hathaway to verify the information in the application amounted to a cursory investigation. But again, the defendants cite no authority to support this assertion. And, as PHL points out, this court has suggested otherwise. *See ClearOne Commc'ns, Inc.*, 494 F.3d at 1250 (applying *Hardy* and concluding that insurer conducted reasonable inquiry into insured's financial statements by (1) sending follow-up questions to insured via email; and (2) verifying information with insured's own CFO). Accordingly, we conclude no reasonable jury could find PHL's investigation so cursory as to preclude reliance under *Hardy*.

The defendants make two other reliance arguments that warrant little consideration. First, they suggest PHL didn't act reasonably in relying on the misrepresentation because its own agents—Crump and Giordano—were allegedly aware of and responsible for it. But for the reasons discussed above, we decline to impute Crump's and Giordano's alleged knowledge to PHL. Second, the defendants argue that "the district court's reliance ruling is deficient" because the district court didn't analyze any of the other alleged misstatements contained in the application. Aplt. Br. 54. But because the district court found that the misstatement about Hathaway's net worth satisfied all the elements of PHL's rescission claim, there was no reason for the court to address any of the remaining misstatements in the application.

## III.    Premiums

Finally, even assuming PHL was entitled to summary judgment on its rescission claim, the defendants argue the district court erred in allowing PHL to

16

retain the premiums paid. Critically, the defendants don't suggest the district court had discretion to allow PHL to keep the premiums, but somehow abused that discretion in doing so. Instead, they argue only that the district court lacked authority, as a matter of law, to authorize retention. Accordingly, we exercise de novo review over the defendants' limited legal argument. *See Vladimirov v. Lynch*, 805 F.3d 955, 960 (10th Cir. 2015) (explaining that we review legal questions de novo).

Utah hasn't addressed whether an insurer who rescinds a policy based on an insured's misrepresentations must return any paid premiums. Here, the district court allowed PHL to keep the premiums in order to return it to the position it was in before it issued the policy—i.e., before it paid commissions to Crump and Giordano that exceeded those premiums. *See Anderson v. Doms*, 75 P.3d 925, 928 (Utah Ct. App. 2003) ("The goal of rescission is to restore the status quo that existed prior to the parties' agreement. The status quo rule . . . 'is equitable, and requires practicality in adjusting the rights of the parties.'" (alteration in original) (quoting *Ong Int'l (U.S.A.) Inc. v. 11th Ave. Corp.*, 850 P.2d 447, 457 (Utah 1993))).

In arguing this was error, the defendants rely solely on *United States Fidelity & Guarantee Co. v. United States Sports Specialty Ass'n*, 270 P.3d 464 (Utah 2012), for the proposition that "an insurer's right to recover reimbursement from an insured may only arise, if at all, under the written terms of their insurance policy." *Id.* at 470. Here, the defendants argue, the policy stated PHL would return any premiums if it

17

rescinded the policy.[7] Thus, the defendants insist, Windsor—as the party who financed the premiums in the first place—is entitled to their return.

But as the district court noted, *United States Fidelity* is distinguishable because the result there turned on the contractual "risk relationship of the insurer and the *insured*." 270 P.3d at 471 (emphasis added). Here, allowing PHL to retain the premiums—rather than allowing Windsor to recover them—won't alter that risk relationship because Windsor isn't the insured. Because the concerns that gave rise to the court's decision in *United States Fidelity* aren't present here, the defendants' reliance on that case is misplaced.

Instead, in resolving this legal issue, we find dispositive the Utah Supreme Court's general pronouncements that (1) the goal of rescission is to restore the status quo; and (2) a trial court has wide discretion in achieving that goal. *See Ong Int'l (U.S.A.) Inc.*, 850 P.2d at 457 (emphasizing that in attempting to restore status quo for purposes of rescission action, trial court "has discretion to fashion an adequate and reasonable remedy so that an aggrieved party is adequately compensated for its loss, so long as that remedy is not duplicative"). Accordingly, we reject the defendants' argument that, as a matter of law, the district court lacked authority to allow PHL to retain the premiums. And because the defendants don't argue the district court otherwise abused its discretion, we affirm its order.

---

[7] The policy states, "If we contest the validity of all or a portion of the face amount provided under this policy, the amount we pay with respect to the contested amount will be limited to the higher of a return of any paid premium required by us for the contested face amount or the sum of any Monthly Deductions made under this policy for the contested face amount." Aplt. Sealed App. vol. 4, at 239.

18

**CONCLUSION**

We affirm the district court's order granting PHL's motion for summary judgment, as well as its order allowing PHL to retain the paid premiums.