[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-12559
_____

D.C. Docket No. 9:11-cv-80427-DMM


STEVEN A. SCIARRETTA,
As Trustee of the Barton Cotton Irrevocable Trust,

Plaintiff–Counter Defendant,


versus

LINCOLN NATIONAL LIFE INSURANCE COMPANY,

Defendant–Third Party Plaintiff–
Counter Claimant–Appellee,

ROBERTA COTTON,

Defendant,

SANFORD L. MUCHNICK,

Third Party Defendant,

IMPERIAL PREMIUM FINANCE LLC,

Non Party–Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(February 26, 2015)

Before ED CARNES, Chief Judge, and RESTANI,[*] Judge, and MERRYDAY,[**] District Judge.

ED CARNES, Chief Judge:

J. Alfred Prufrock saw the moment of his greatness flicker and the eternal footman hold his coat and snicker.[1]  If there had been an insurance policy on his life like the one that gave rise to this case, Prufrock might have seen beside the footman a grinning speculator rubbing his hands in gleeful anticipation.

We are all, in the long view, born astride the grave.  But allowing parties to use life insurance policies to bet on when an unrelated person will drop off into the grave raises public policy concerns, which have led to restrictions on the practice.  One of the principal restrictions is the requirement that the purchaser of a policy have an insurable interest in the insured's life.  As often happens with regulatory

---

[*] Honorable Jane A. Restani, United States Court of International Trade Judge, sitting by designation.

[**] Honorable Steven D. Merryday, United States District Judge for the Middle District of Florida, sitting by designation.

[1] T.S. Eliot, "The Love Song of J. Alfred Prufrock," ll. 84–85 (1920) ("I have seen the moment of my greatness flicker/And I have seen the eternal Footman hold my coat, and snicker/And in short, I was afraid.").

2

restrictions aimed at thwarting the operation of a market, evasive schemes have arisen to circumvent the insurable interest requirement.  Imperial Premium Finance LLC used one of those schemes, which led to a criminal investigation of the company and also to it being subpoenaed in a civil case arising from the scheme.

In response to that subpoena Imperial designated a corporate witness to be deposed, as provided in Rule 30(b)(6) of the Federal Rules of Civil Procedure, and that witness also testified for it at trial. After the trial was completed, the district court imposed a monetary sanction against Imperial based on the court's finding that the company had in bad faith prepared the witness selectively in order to further its interest.  This is Imperial's appeal of that sanctions order.

## I.

Although Imperial is not a party to this lawsuit, the company's actions led to it.  Imperial's primary business involved stranger-originated life insurance (STOLI).  A STOLI policy is a speculative investment device that entails gambling on the lives of the elderly.  In its purest form, a STOLI transaction works like this: A speculator secures an agreement with a person, who is usually elderly, authorizing the speculator to buy insurance on that person's life.  The speculator usually gets the policy in the largest amount available and pays the premiums, hoping to profit in one of two ways.  One way is if the insured dies before the premiums paid exceed the death benefit.  Under that scenario the sooner the

3

insured dies, the fewer the premium payments that are necessary to obtain the payout, and the greater the return on investment.  The other way the speculator can profit is by selling the policy to another speculator for more than the premiums paid up to the point of that sale.

Imperial's business was not a STOLI scheme in its purest form.  Instead of buying a policy on a person's life outright, Imperial provided financing for life insurance premiums in the form of a loan whose terms allowed Imperial to foreclose on the policy and become its owner if the borrower defaulted.  The typical loan had a term of two years, a relatively high floating interest rate, and "substantial" origination fees, all of which made the borrower more likely to default.  For example, the $335,000 loan Imperial made in this case had an interest rate that floated between 11 and 16 percent, and it had origination fees of nearly $112,000 — more than a third of the loan principal.

As mentioned above, most states try to prevent STOLI transactions by requiring purchasers of insurance policies to have an insurable interest in the insured's life.  See, e.g., Ala. Code § 27-14-3(f) (requiring an insurable interest at the time a policy becomes effective); Fla. Stat. § 627.404(1) (requiring a person purchasing insurance on "the life or body of another individual" to have "an insurable interest in the individual insured"); Ga. Code § 33-24-3(h) (requiring an insurable interest at the time a policy becomes effective).  But see Tex. Ins. Code §

4

1103.056 (allowing any person, including a corporation, to purchase insurance on any other person's life so long as the insured consents in writing). Seeking to evade those insurable interest requirements, Imperial drafted its loan agreements to require that during the term of the loan the policy be held in irrevocable trust (with a trustee chosen by Imperial) for the benefit of the insured's relatives. The structure of Imperial's loans made them a sure bet with nothing but upside. If the borrower managed to pay off the loan when it came due, Imperial got its fees and interest, walking away with as much as a two-thirds return on its investment in two years. If the insured died before the loan matured, the arrangement ensured that Imperial could collect out of the policy proceeds the loan principal, the fees, and the interest it was owed. That was usually a substantial sum.

But it often was not as much as the value of the policies themselves, under which the beneficiary stood to collect hundreds of thousands or even millions of dollars upon the death of the insured. The ticket to that jackpot for Imperial was the clause in the loan agreements allowing it to foreclose on the policies in the event of default. In part because of the loans' oppressive terms, most of Imperial's loan customers did default. As a result, Imperial knew from the outset that it stood a better than even chance of not just collecting the interest and fees but obtaining by foreclosure ownership of the policy and the full amount of the policy upon

5

death of the insured.  And it would all be done, Imperial thought, without violating the letter of the laws designed to prevent STOLI transactions.

Imperial's carefully designed scheme to get around the insurable interest laws did not keep it out of trouble.  Part of its practice was to "assist" prospective insureds in filling out the insurance applications, and that is what led to trouble.  Because insurers want to avoid issuing policies that will be used in a STOLI scheme, they typically require applicants to disclose any intent to seek premium financing.  Knowing this, perpetrators of STOLI schemes often make what the Florida Department of Insurance describes as "misrepresentation[s], falsification[s], or omission[s] of material facts in the life insurance application."[2]  And Imperial was no exception.  It eventually admitted that when its employees thought that truthfully disclosing the financing arrangements would harm the chances of having a policy issued, they "facilitated and/or made misrepresentations on applications that the prospective insured was not seeking premium financing."  That fraudulent behavior came to the attention of the United States Attorney for the District of New Hampshire, who in 2011 launched an investigation into Imperial's business.  That investigation resulted in an April 2012 non-prosecution agreement with Imperial.  In return for not being prosecuted, the company agreed to give up

---

[2] Fla. Office of Ins. Regulation, Stranger-Originated Life Insurance ("STOLI") and the Use of Fraudulent Activity to Circumvent the Intent of Florida's Insurable Interest Law 2 (Jan. 2009).

6

its premium financing business, fire or accept the resignations of the employees responsible for that business, and pay an $8 million fine.

With that background in mind, we turn to the facts of this case that led to Imperial being sanctioned.

## A.

In late 2007, Florida resident Barton Cotton met with insurance agent Dennis Felcher because Cotton wanted to buy a multimillion-dollar life insurance policy and finance the premium payments. Felcher referred Cotton to Larry Bryan, who Felcher knew was "doing that kind of work." Bryan contacted Imperial about financing the premium payments for Cotton. Imperial, of course, was interested. In April 2008, Cotton granted Bryan's company WealthModes the exclusive right to procure, finance, and sell insurance policies on his life.

The next month, Cotton and an irrevocable trust in his name applied to Lincoln National Life Insurance Company for an $8 million life insurance policy. Consistent with Imperial's standard practice and in order to evade Florida's insurable-interest law, the beneficiaries of the trust were Cotton's wife and children. Cotton falsely stated on the insurance application that he was not buying the policy for resale and that he would not use a third party to finance the premium payments.

7

Lincoln issued Cotton a $5 million policy, which became an asset of the Cotton trust. Bryan advanced the premium payments to the trust until Imperial lent the trust $335,000. The trust used that money to repay Bryan's advance and to continue making the premium payments. As usual, Imperial's premium financing loan had a floating interest rate between 11.5% and 16%, and the loan agreement authorized it to foreclose on Cotton's policy and become its owner if the trust didn't repay the loan by its maturity date. Because of the high interest rate and an "origination fee" of nearly $112,000, after less than two years Imperial's $335,000 loan to the Cotton trust had ballooned to more than $557,000.

In May 2010 the eternal footman came into view — Cotton was diagnosed with esophageal cancer. Cotton's bad news was good news for Imperial because the value of a STOLI policy varies inversely with the life expectancy of the insured. Imperial began marketing Cotton's policy for sale. The loan used to finance the policy reached maturity and became due on August 6, 2010, and Cotton died two months later. At the time of his death the trust had not paid back Imperial for the loan, but Imperial had not yet foreclosed on it, which left the trust for the benefit of Cotton's family as the record owner of the policy.

After learning of Cotton's death, Lincoln launched an investigation which turned up the fact that Imperial had financed the purchase of the policy on Cotton's life in order to market it to speculators under a STOLI scheme. Concluding that

8

was enough to amount to fraud in the procurement of the policy, Lincoln refused to pay the trustee of the Cotton trust the death benefit.

## B.

In April 2011 the Cotton trustee sued Lincoln for the death benefit.  Lincoln counterclaimed, alleging fraud, negligent misrepresentation, and civil conspiracy.  Imperial made a second loan to the trust to cover its litigation costs but, as we have mentioned, it was not a party to the case.  Still, Imperial asked its outside counsel to represent the trust.

During discovery, Lincoln sought to depose Imperial under Rule 30(b)(6) of the Federal Rules of Civil Procedure.  By that time, Imperial was aware that it was under criminal investigation.  Because the topics included in Lincoln's subpoena touched on subjects related to the criminal investigation, Imperial's managers and employees exercised their individual Fifth Amendment rights and all refused to testify in the Rule 30(b)(6) deposition in the Lincoln case.  As a result, Imperial sought from the court either a stay of its deposition or permission to prepare and use an outside witness to testify as a designated corporate representative in the deposition and at trial.  The court allowed Imperial to use an outside witness for that purpose.

Imperial hired John Norris, an independent economist with a history of testifying as an expert witness, to serve as its designated corporate representative.

9

Imperial provided Norris with some 20,000 pages of documents, and its counsel met with him to brief him on the corporation's knowledge about the topics listed in the subpoena.[3]  Imperial's managers and employees were as reticent with Norris as they were with Lincoln.  None of them would talk with him, so Imperial communicated with Norris through a single lawyer in its general counsel's office.  Along with that official preparation, Norris also did some "slight Googling of Imperial" and "found some general background information" about the company.

Lincoln deposed Norris for six hours on January 4, 2012.  During the deposition, Norris was often unable to answer questions apparently because Imperial had not briefed him on the answers.

Lincoln later subpoenaed Imperial to testify at trial.  The topics in the trial subpoena were identical to those in the Rule 30(b)(6) deposition subpoena.  Imperial told Lincoln that it would again provide Norris to testify.  To prepare, Norris reviewed the deposition transcript and the attached exhibits, but he did not seek additional information about topics on which he had lacked information during the deposition.  Imperial's outside counsel, who was responsible for

---

[3] Imperial said that its outside counsel billed 72 hours of attorney time and 56 hours of paralegal time preparing Norris to testify at the deposition.  Norris himself billed 50 hours of his time preparing for and testifying at the deposition.  According to him, he used that time to review the subpoena and pleadings and to go "through th[e] documents in the context of" the topics in the notice of deposition.

10

educating Norris, did not ask him to obtain any additional knowledge in order to testify at trial.

Near the end of the trial, Lincoln called Norris as a witness. During the course of his direct testimony, which spans 31 transcript pages, he was unable to answer about 20 questions due to his lack of knowledge. Norris volunteered four times that he had done nothing "to further [his] understanding" or to "seek any further clarification" about materially identical questions that he had been unable to answer in his deposition. As he put it, "the thought never crossed my mind in the course of preparation." On cross-examination, the attorney for the trust elicited testimony that Imperial had financed the premiums for 183 Lincoln policies. After cross-examination ended, the court asked Norris about the mushrooming loan balance, about the interest calculations, and about the reasons for commission payments to insurance agent Felcher. Norris knew next to nothing about those matters or the loan. He tried to arrive at some answers by performing calculations on the stand, but he could not get it right. He arrived at the wrong amount of interest by incorrectly characterizing more than $78,000 in fees as interest. He also had no answer for the question about the payments to insurance agent Felcher, explaining that he had simply not asked Imperial about that.

11

The jury returned a verdict in favor of the trust.  It found that Cotton and others had conspired to commit an unlawful act[4] and that Cotton had made material misrepresentations on the application for insurance, but it also found that Lincoln had not relied on or been damaged by the misrepresentations and similarly had not been injured by the conspiracy.  The jury also specifically found that Cotton had not intended to "assign[] or transfer[] [the policy] to someone with no insurable interest in [his] life."  The court entered judgment for the Cotton trust for the $5 million death benefit and $850,000 in attorney's fees,[5] plus costs and interest.  Of that $5.85 million, the trust paid approximately $2.24 million to Imperial for the principal, interest, and fees it owed on Imperial's two loans.  The remainder of the judgment went to Cotton's wife and children as beneficiaries of the Cotton trust.

## C.

The morning after Norris testified at trial, the court expressed concern about his and Imperial's conduct.  The court characterized Norris as having been "blatant in his failure to follow the rules" for a designated witness.  Imperial, it said, "hid

---

[4] The verdict form suggested that the unlawful act might have been an act "such as procuring a policy that lacked an insurable interest at inception, or misrepresenting material facts to Lincoln in the application for the Cotton Policy."  But the form did not specify which of those acts (or what other act) the jury found Cotton and others had conspired to do.

[5] Under Florida Statute § 627.428, an insurance company that loses an action for payment of a benefit must pay the plaintiff's reasonable attorney's fees.

12

behind" Norris, meaning that it hid facts harmful to it by not briefing Norris on them. The court notified the parties that it was considering sanctions against Imperial and Norris, and it invited briefing and argument on that issue.

After Lincoln and Imperial filed briefs on the issue, the court held a two-hour hearing. During the hearing, the court offered Imperial the chance to present evidence and argue against sanctions. It observed that Norris had given "one of the worst performances by a witness that [the court had] ever seen," that he "didn't do his job as a witness," that he "was basically trying to help Imperial to the detriment of everyone else," and that he had prepared only "to help his client's side of the litigation."

After the hearing, the district court issued an order assessing sanctions in the amount of $850,000 against Imperial. The district court explained that Imperial was the driving force behind the litigation and its selective preparation of Norris constituted bad faith. It said that the company's "promise of an educated and independent witness was simply a ploy to allow [it] to escape scrutiny, yet still benefit." The court found that Norris had "exhibited deliberate ignorance to any inquiry harmful to Imperial's interests while at the same time trying to affirmatively help the Trust and Imperial's counsel at every opportunity." It reasoned that because Imperial had created the issues that led to litigation, Imperial and not Lincoln should bear the costs of the plaintiff's attorney's fees. The

13

$850,000 sanction left the main damages award to the Cotton trust undisturbed but inverted the award of fees under Florida Statute § 627.428, in order to "prevent[] Imperial from obtaining attorney's fees and costs from the party harmed by its inequitable conduct."

## II.

Courts have the inherent power to police themselves and those appearing before them. Chambers v. NASCO, Inc., 501 U.S. 32, 46, 111 S. Ct. 2123, 2133 (1991). The key to unlocking that inherent power is a finding of bad faith. Barnes v. Dalton, 158 F.3d 1212, 1214 (11th Cir. 1998). Once unlocked, the power carries with it the authority to assess attorney's fees as a sanction for bad faith conduct. Chambers, 501 U.S. at 45–46, 111 S. Ct. at 2133.

We review a court's exercise of its inherent power to impose sanctions only for an abuse of discretion. Chambers, 501 U.S. at 55, 111 S. Ct. at 2138; Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc., 561 F.3d 1298, 1303 (11th Cir. 2009). An abuse of discretion occurs when the district court "applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous," or "when it misconstrues its proper role, [or] ignores or misunderstands the relevant evidence." FTC v. AbbVie Prods. LLC, 713 F.3d 54,

14

61 (11th Cir. 2013) (citation and quotation marks omitted).  Imperial raises three arguments for reversal.  None have merit.

A.

First, Imperial points out that Lincoln did not object to Norris' Rule 30(b)(6) deposition testimony and had asked him questions on the same topics at trial.  It contends that Lincoln thereby waived any objections to Norris' answers (or nonanswers) and was estopped from seeking sanctions.  Even if Lincoln did waive and was estopped, the district court didn't waive and wasn't estopped.  Lincoln did not raise the subject of sanctions or impose them.  The district court did.  And district courts have the inherent power to bring up the question of sanctions and answer it.  See Roadway Express, Inc. v. Piper, 447 U.S. 752, 765–66, 100 S. Ct. 2455, 2463–64 (1980) (court may assess attorney's fees on a finding of bad faith); Muhammad v. Walmart Stores E., L.P., 732 F.3d 104, 108 (2d Cir. 2013) ("[S]ua sponte sanctions . . . should issue only upon a finding of subjective bad faith."); Willhite v. Collins, 459 F.3d 866, 870 (8th Cir. 2006) (a sua sponte award of attorney's fees "is permissible under a court's inherent powers as long as the person being sanctioned has demonstrated bad faith"); In re Itel Sec. Litig., 791 F.2d 672, 675 (9th Cir. 1986) ("Sanctions may also be awarded sua sponte under the court's inherent power.").

15

B.

Second, Imperial contends that the sanction was not merited because Imperial and Norris complied with the Rule 30(b)(6) and trial subpoenas. That depends on what "complied with" means. Imperial claims that it educated Norris on each of the topics in Lincoln's subpoenas, but this is one of those cases where "a little learning is a dangerous thing" for a party's purse.[6] The district court found that Imperial selectively educated Norris and acted in bad faith in doing so. We review a court's finding of bad faith, and the subsidiary factual findings that go into it, only for clear error. Mar. Mgmt., Inc. v. United States, 242 F.3d 1326, 1331 (11th Cir. 2001). Under clear error review, we will reverse only if "after viewing all the evidence, we are left with the definite and firm conviction that a mistake has been committed." Travelers Prop. Cas. Co. of Am. v. Moore, 763 F.3d 1265, 1268 (11th Cir. 2014). We are not.

The district court determined that Imperial had acted in bad faith based on a finding that, among other actions, Imperial had selectively prepared Norris, not that it had failed to prepare him at all. The court pointed out that Norris was prepared to answer questions in ways that were helpful to Imperial, but that he lacked knowledge when the questions turned to areas that might cast Imperial in a bad light or otherwise harm it. Preparing a designated corporate witness with only

---

[6] See Alexander Pope, "An Essay on Criticism" l. 217 (1711).

16

the self-serving half of the story that is the subject of his testimony is not an act of good faith.  See Fed. R. Civ. P. 30(b)(6) ("The person[] designated must testify about information known or reasonably available to the organization.").

A contrary result would allow Imperial to convert the investigation into its admitted criminal behavior into a stroke of good luck.  Imperial's own employees who were knowledgeable about the transaction that gave rise to the litigation could not take the stand and offer non-answers like Norris did, at least not without perjuring themselves.  So the company seized on the existence of the criminal investigation as an opportunity to craft a perfect witness for its interests:  one who was knowledgeable about helpful facts and dumb about harmful ones.  As the district court pointed out, that all-too-clever behavior is not far from the long-disallowed use of the Fifth Amendment as both a sword and a shield.  See United States v. Rylander, 460 U.S. 752, 758, 103 S. Ct. 1548, 1553 (1983) (a court must not "convert the privilege from the shield against compulsory self-incrimination which it was intended to be into a sword whereby a claimant asserting the privilege would be freed from adducing proof in support of a burden which would otherwise have been his"); Arango v. U.S. Dep't of the Treasury, 115 F.3d 922, 926 (11th Cir. 1997) (same).  The district court did not err, much less clearly err, when it found bad faith in Imperial's calculated preparations that produced the one-way witness that Imperial designated to testify for it.

17

C.

Third, Imperial contends that the sanction imposed by the court violates its due process rights because the $850,000 sanction is "unjust and unrelated either to any harm caused to Lincoln or the alleged misconduct committed by Imperial."[7] To make that argument, Imperial claims that its only misconduct was its designee's testimony at deposition and at trial. But that's enough, and there was more. Imperial was, as the court found, "the driving force behind the litigation" and was "at the heart of" the conspiracy that the jury found. Lincoln would never have needed to go to court in the first place but for Imperial's misconduct. To address that misconduct, the district court tailored its sanction to "prevent[] Imperial from obtaining attorney's fees and costs from the party harmed by its inequitable conduct" — that is, Lincoln. In these circumstances it was not an abuse of discretion for the district court to determine that assessing attorney's fees as a sanction was both just and closely enough related to the harm that Imperial caused.

_____

[7] Imperial also argues that the district court should have complied with the rules governing civil contempt, which allow contempt sanctions only to coerce compliance with the court's order or to compensate the complainant. See Martin v. Guillot, 875 F.2d 839, 845 (11th Cir. 1989). Sanctions imposed for contempt of court are not, however, the same thing as sanctions imposed under the court's inherent power to police against bad faith conduct before it. Different rules apply to each. See Chambers, 501 U.S. at 46, 111 S. Ct. at 2133 (distinguishing between attorney's fee awards under the court's "inherent power to police itself" and the "sanctions available for contempt of court") (quotation marks omitted); In re Mroz, 65 F.3d 1567, 1575 (11th Cir. 1995) (same).

18

The district court did not require Imperial to pay Lincoln's own fees, but only those of the Cotton trust that were shifted to Lincoln under Florida law as a result of the judgment against Lincoln.  In other words, because of its misconduct Imperial was required to pay the fees of the party that had to prevail in order for Imperial to recover on its loans.

The district court's findings were not clearly erroneous and its imposition of sanctions was not an abuse of discretion.  The sanctions order is **AFFIRMED**.