[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-14689

_____

D.C. Docket No. 1:17-cv-23136-MGC

ESTATE OF PHYLLIS M. MALKIN,
By its Personal Representative, Toni Ellen Guarnero,

Plaintiff - Appellee -
Cross Appellant,

versus

WELLS FARGO BANK, NA,
as Securities Intermediary,

Defendant - Appellant -
Cross Appellee,

BERKSHIRE HATHAWAY LIFE INSURANCE
COMPANY OF NEBRASKA,

Defendant - Appellant -
Cross Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 27, 2021)

Before MARTIN, GRANT, and BRASHER, Circuit Judges.

MARTIN, Circuit Judge:

This appeal involves a dispute over what Phyllis Malkin's Estate calls an illegal stranger-originated life insurance ("STOLI") policy. The Delaware Supreme Court—the controlling authority on the state law issues in this case—has described STOLI policies as wagering contracts in which "a life insurance policy [is] procured or effected without an insurable interest." PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Tr., ex rel. Christiana Bank & Tr. Co. ("Price Dawe"), 28 A.3d 1059, 1071 (Del. 2011). These policies are prohibited by the Delaware constitution. Id. This appeal requires us to decide whether Ms. Malkin's life insurance policy was this type of STOLI policy.

In 2006, Ms. Malkin obtained a $4 million insurance policy on her life through American General Life Insurance Company. She worked with several entities to get a loan to finance the AIG Policy. Eventually, Ms. Malkin defaulted on the loan and opted to relinquish her rights to the AIG Policy to satisfy the balance of the loan. The AIG Policy was ultimately purchased by Berkshire Hathaway Life Insurance Company of Nebraska, with Wells Fargo Bank, N.A. serving as the securities intermediary. After Ms. Malkin passed away, her Estate filed suit seeking to recover the proceeds of the AIG Policy from Berkshire and Wells Fargo, claiming it was an illegal STOLI policy. The District Court ruled in

2

favor of the Estate. It found that because the AIG Policy lacked an insurable interest at its inception, it was void under Delaware Code Annotated Title 18, § 2704(a), which, in relevant part, governs the purchase of a life insurance policy on the life of another person. The District Court thus ruled to allow the Estate to recover the Policy's proceeds under § 2704(b).[1]

After careful consideration, we affirm the District Court's finding that the AIG Policy is void under § 2704(a). We must, however, reverse the District Court's decision to strike Berkshire's counterclaims for fraudulent and negligent misrepresentations. We defer our decision on the remaining issues in this case pending certification of two questions to the Supreme Court of Delaware.

## I.    BACKGROUND

In 2005, Ms. Malkin and her husband Paul were retired and living in Florida when an acquaintance referred them to Larry Bryan and his company, Simba.[2] Simba was in the business of "premium financing of life insurance," offering its clients what it referred to as "life insurance capacity transactions," where life insurance policies were acquired "by way of non-recourse premium financing."

---

[1] Section 2704(b) provides a cause of action for an insured or an insured's estate to recover the benefits of a life insurance policy that lacks an insurable interest under § 2704(a).

[2] This Court has already addressed at least two STOLI policies brokered by Mr. Bryan and Simba. See Sun Life Assurance Co. of Can. v. U.S. Bank Nat'l Ass'n, 693 F. App'x 838, 839–40 & n.1 (11th Cir. 2017) (per curiam) (unpublished); Sciarretta v. Lincoln Nat'l Life Ins. Co., 778 F.3d 1205, 1209–10 (11th Cir. 2015).

Sun Life Assurance Co. of Can. v. U.S. Bank Nat'l Ass'n ("Sun Life"), No. 14-CIV-62610-BLOOM/VALLE, 2016 WL 161598, at *1 (S.D. Fla. Jan. 14, 2016) (quotation marks omitted), aff'd in part, rev'd in part, and remanded, 693 F. App'x 838.[3]  Simba targeted a particular clientele: healthy seniors with excess wealth who did not wish to purchase life insurance for their own personal use, but who wanted to make money off of their life insurance capacity.  Id. at *2.  Simba told potential clients that there were no obligations or out of pocket expenses to them.  See id.

Ms. Malkin "did not need" and "did not want" life insurance before meeting with Simba.  Neither did she express any interest in paying for life insurance.  The Malkins were simply interested in Simba's "risk free opportunity to make money."

Ms. Malkin got the life insurance policies through Simba's typical process. This involved Simba introducing its clients to Coventry Capital I LLC ("Coventry"), and Simba and Coventry worked together to get approval from an insurer, in this case American General Life Insurance Company ("AIG"). Ultimately, three separate policies were taken out on Ms. Malkin's life: the $4-million AIG policy at issue here (the "AIG Policy"); a $5-million policy issued by Sun Life Assurance Company (the "Sun Life Policy);[4] and another $4-million

---

[3] The background of this case overlaps with that of Sun Life, as explained below.  We will therefore cite to the facts of Sun Life to the extent they apply here.

[4] The Sun Life Policy was litigated separately.  See Sun Life, 2016 WL 161598, at *1 (explaining that Sun Life, the insurer, sought to have the Sun Life Policy rendered void as an illegal STOLI policy).

policy procured through a separate entity called Sail Funding Trust II.  Ms. Malkin got a total of $13 million in life insurance coverage.

We briefly describe how Ms. Malkin obtained her life insurance policies because those details are relevant to whether there was an insurable interest in the AIG Policy.  Coventry acted as the program administrator and servicing agent of a life insurance premium financing program in connection with LaSalle Bank.  In that capacity, Coventry first approved a non-recourse premium finance loan for the Sun Life Policy.[5]  Coventry required Ms. Malkin to fill out various forms that were "not negotiable," including a document in which she appointed Coventry as her attorney-in-fact, with full authority to originate, service, or liquidate "any life insurance policies on [her] life[.]"  Ms. Malkin also signed a loan application form with LaSalle Bank, for which Coventry acted as the program administrator for LaSalle Bank.  And the Malkins agreed that a trust would be established to hold insurance policies on Ms. Malkin's life.

At this time, Coventry noted internally that it was "hoping to add" another Malkin policy on top of the Sun Life Policy—the $4-million AIG Policy at issue here.  Mr. Bryan, Simba's founder, said Ms. Malkin was not the one who decided

---

[5] Having a "non-recourse loan" means "that at the end of the loan period, Malkin could relinquish the Policy to Coventry and walk away" from the loan without any personal financial loss, "although the collateral listed in the loan, that is, the Policy, would be forfeited."  <u>Sun Life</u>, 2016 WL 161598, at *7.

to apply for coverage from either Sun Life or AIG.  See, e.g., R. Doc. 135-4 at 68 (confirming that prospective insureds entered into nonnegotiable "take it or leave it deals").

In March 2006, the Malkins entered into an agreement with Wilmington Trust Company to create a Delaware trust for the purpose of applying for and holding both the Sun Life and AIG Policies ("the Trust").  Coventry's initial plan was for the Sun Life Policy and the AIG Policy to be funded under a single loan, which would be obtained by a single sub-trust to the Trust.  However, by April 2006, Coventry changed its plan and ultimately each policy was funded under a separate but identical loan entered into by two separate but identical sub-trusts of the Trust.

The AIG Sub-Trust, LaSalle Bank, and Coventry entered into a $264,895.87, 26-month, non-recourse agreement to fund the AIG Policy.  The AIG Loan was to be funded April 7, 2006, while the Sun Life Policy would be issued the following week.  Because the Sun Life Policy was funded under a separate loan from the AIG Policy, Coventry repeated the process for the Sun Life Policy.  A few weeks later, the Sun Life Sub-Trust, LaSalle Bank, and Coventry entered into a $238,050, 26-month, non-recourse agreement to fund the Sun Life Policy.  At the end of 26 months, Ms. Malkin would owe $360,265.34 on the AIG Loan and $340,496.41 on the Sun Life Loan.  Coventry paid the initial premiums to AIG on the AIG Policy.

6

Mr. Bryan confirmed that the Malkins paid no premiums on either the AIG Policy or the Sun Life Policy.[6]

On June 16, 2008, Coventry told the AIG Sub-Trust that the balance on the AIG Loan was due. The notice said Coventry was going to "foreclose upon and sell or otherwise liquidate" the AIG Policy unless Ms. Malkin paid the entire AIG Loan amount plus additional interest. Instead of paying the AIG Loan, Ms. Malkin agreed that the AIG Sub-Trust would satisfy the $360,265.34 balance on the AIG Loan by "relinquishing all right, title and interest in and to the [AIG] Policy" to Coventry. When the Sun Life Loan became due, Ms. Malkin and Coventry repeated the same process with the Sun Life Policy, which meant Malkin relinquished all rights to the Sun Life Policy to Coventry as well.

In 2012, Wells Fargo became the owner and beneficiary of the Policy as securities intermediary.[7] In 2013, Berkshire agreed to buy 125 life insurance policies, including the AIG Policy, from Coventry with Wells Fargo serving as the

---

[6] Mr. Bryan said the agreement between the insured and the funder "was structured so that ownership of the policy would automatically transfer to the funder who would make all future payments directly to the insurance company." He also explained that the Malkins, like the other Simba clients who had previously done deals with Coventry, paid no premium payments, fees, or anything else. See R. Doc. 135-4 at 28, 34, 41, 82–83 (conceding that Simba's marketing materials advertised "[n]o obligations or out of pocket expenses" and confirming that, consistent with those materials, Ms. Malkin had "[n]o out of pocket cost").

[7] The AIG Policy changed hands several times before this. This was also true of the Sun Life Policy.

securities intermediary.[8]  In this purchase agreement, Coventry represented to Berkshire that to its knowledge none of the policies "was originated in connection with a STOLI transaction."  Berkshire paid Coventry $322,103 for the AIG Policy and then made $137,194.20 in premium payments to AIG.

Ms. Malkin passed away in September 2014.  On October 27, 2014, AIG paid death benefits from the AIG Policy to Wells Fargo in the amount of $4,013,976.47.  On October 29, Wells Fargo credited that full amount to the securities account that it maintained for Berkshire.  Berkshire then transferred the proceeds to another of its Wells Fargo accounts.

In 2017, Ms. Malkin's Estate filed suit to recover the AIG Policy proceeds from Wells Fargo under Delaware's insurable interest statute, § 2704(b).  After some third-party indemnification litigation by Wells Fargo and Berkshire against Coventry, the Estate filed an Amended Complaint, adding Berkshire as a defendant.

The parties filed motions for summary judgment, and the District Court issued its order granting summary judgment to the Estate.  The court found that: (1) the Estate's claim is governed by Delaware law; (2) the AIG Policy lacked an

---

[8] Under Delaware law, a "securities intermediary" refers either to "a clearing corporation" or "a person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity."  Del. Code Ann. tit. 6, § 8-102(a)(14).

insurable interest at inception and was therefore void ab initio; (3) Ms. Malkin did not relinquish her Estate's rights to the proceeds of the AIG Policy; (4) Berkshire and Wells Fargo's Uniform Commercial Code ("UCC") defenses failed as a matter of law; and (5) the Estate is entitled to recover the proceeds of the AIG Policy under § 2704(b). Berkshire and Wells Fargo timely appealed the final judgment. The Estate cross-appealed.

## II.    STANDARD OF REVIEW

"We review a grant of summary judgment de novo, applying the same legal standard applied by the district court in the first instance." Cox v. Adm'r U.S. Steel & Carnegie, 17 F.3d 1386, 1395 (11th Cir. 1994), opinion modified on other grounds on reh'g, 30 F.3d 1347 (11th Cir. 1994) (quotation marks omitted and alterations adopted).

## III.    DISCUSSION

A.    THE DISTRICT COURT DID NOT ERR BY FINDING THE AIG POLICY WAS VOID UNDER § 2704(a)

Defendants argue that the District Court erred by finding the AIG Policy was illegally procured and void as a matter of law. First, Defendants say the District Court failed to require the Estate to demonstrate that the AIG Policy "had the critical characteristics that distinguish an unlawful transaction from a legitimate attempt to procure a policy for later sale" on the legal life settlement market. As part of this argument, Defendants say the court ignored evidence that Ms. Malkin

intended to sell the AIG Policy on the open market herself.  Defendants also argue that the District Court resolved disputes of fact in the Estate's favor and treated the Sun Life decision as binding when the facts of this case are different.

Before we address Defendants' arguments, however, some background on STOLI schemes, Delaware's insurable interest statute, and Price Dawe is necessary.

1. STOLI Policies and *Price Dawe*

Section 2704(a) of the Delaware Insurance Code provides that:

> [a]ny individual of competent legal capacity may procure or effect an insurance contract upon his or her own life or body for the benefit of any person, but no person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under such contract are payable to the individual insured or his or her personal representatives or to a person having, at the time when such contract was made, an insurable interest in the individual insured.

Del. Code Ann. tit. 18, § 2704(a) (emphasis added).  As the controlling case, Price Dawe, explains, the first clause of this statute makes clear that a person may procure insurance "on his own life for the benefit of anyone."  Price Dawe, 28 A.3d at 1073.  The second clause "concerns procuring insurance on the life of another."  Id.  Under the second clause, "policies 'procure[d] or cause[d] to be procured' on the life of someone other than the person seeking the insurance must be payable to the 'insured or his/her personal representatives or to a person having,

10

at the time when such contract was made, an insurable interest in the individual insured.'" Id. (quoting § 2704(a)). The Supreme Court of Delaware has made clear that § 2704(a) allows an insured "to take out an insurance policy on his own life," but "prohibits persons other than the insured from procuring . . . insurance, unless the benefits are payable to one holding an insurable interest in the insured's life." Id. at 1073–74.

Section 2704(a) thus "serves the substantive goal" of preventing people from gambling on a human life. Price Dawe, 28 A.3d at 1074; see also id. at 1071 ("[A] life insurance policy procured or effected without an insurable interest is a wager on the life of the insured [that] the Delaware Constitution prohibits."). These wagering contracts are also called STOLI policies, or STOLI schemes. See Sciarretta, 778 F.3d at 1207–08; Price Dawe, 28 A.3d at 1074 ("STOLI schemes are created to feign technical compliance with insurable interest statutes."). STOLI schemes inherently conflict with § 2704(a) because they allow circumvention of the insurable interest requirement by having the insured purchase the policy in his own name with the speculator's money (and, ultimately, for the speculator's benefit). See Sciarretta, 778 F.3d at 1207–08.

Nevertheless, STOLI policies became popular during the mid-2000s because they were profitable. See Price Dawe, 28 A.3d at 1069–70 (explaining the history of STOLI policies). "In its purest form," a STOLI scheme works like this:

11

> A speculator secures an agreement with a person, who is usually elderly, authorizing the speculator to buy insurance on that person's life. The speculator usually gets the policy in the largest amount available and pays the premiums, hoping to profit in one of two ways. One way is if the insured dies before the premiums paid exceed the death benefit. Under that scenario the sooner the insured dies, the fewer the premium payments that are necessary to obtain the payout, and the greater the return on investment. The other way the speculator can profit is by selling the policy to another speculator for more than the premiums paid up to the point of that sale.

Sciarretta, 778 F.3d at 1208. The case we address here falls into the latter category, where "the basic idea is that a 'stranger'"—here Simba and Coventry—"persuades a senior citizen to obtain a life insurance policy on his own life so that the policy can subsequently be transferred and sold in the market." Columbus Life Ins. Co. v. Wells Fargo Bank ("Snyder"), No. C.A. No. 20-833-MN-JLH, 2021 WL 106919, at *2 (D. Del. Jan. 12, 2021). "To induce the senior to participate, the stranger may fund the policy premiums and may even pay compensation to the senior." Id. One journal likened participation in a STOLI scheme to "investing with the grim reaper."[9]

Whether an insurance policy qualifies as a STOLI policy turns on whether the owner of the policy has an insurable interest in the insured. Price Dawe clarified that whether the insurable interest requirement is met—and thus whether

---

[9] See Douglas R. Richmond, Investing with the Grim Reaper: Insurable Interest and Assignment in Life Insurance, 47 Tort Trial & Ins. Prac. L.J. 657 (2012).

12

the policy is legal—is analyzed at "'the time when such contract was made,' i.e., the moment the life insurance contract becomes effective." 28 A.3d at 1074 (quoting § 2704(a)). Because this is the distinguishing moment, "the insurable interest requirement does not place any restrictions on the subsequent sale or transfer of a bona fide life insurance policy." Id. However, if the insured "procures the policy at the behest of another, the policy may nevertheless lack a legally insurable interest." Id. at 1075 (quotation marks omitted). To determine who procures a life insurance policy, "we look at who pays the premiums." Id. If a third party financially induces the insured to procure a life insurance policy "with the intent to immediately transfer the policy to a third party," Price Dawe says this is a mere cover for a wager and the contract lacks an insurable interest and is therefore illegal. See id.

In this appeal, Defendants argue there is an insurable interest in the AIG Policy. First, they say the court dismissed "as legally irrelevant" evidence that Ms. Malkin intended to sell the AIG Policy for her own profit on the open market. Second, Defendants say the evidence shows that the Malkins, not Coventry, paid the premiums on the AIG Policy. Third, Defendants say the District Court improperly resolved disputes of material fact in finding that Coventry "overwhelmingly arranged and governed" the process of procuring the AIG Policy as a cover for a wager on a human life. We address each argument in turn.

13

2. <u>Ms. Malkin's Intent Is Irrelevant</u>

Defendants argue that Ms. Malkin's intent in procuring the AIG Policy matters for purposes of determining whether it "had the critical characteristics" that distinguish a lawful transaction from an unlawful one. They say <u>Price Dawe</u> holds that a policy lacks an insurable interest (and is therefore unlawful) "only if it was procured pursuant to a straw-purchaser arrangement." In support of this argument, Defendants say the District Court erred by dismissing evidence that Ms. Malkin and Coventry had an arrangement whereby Malkin intended to sell the AIG Policy for a profit on the open market. Because they say Ms. Malkin "had no intent <u>at the time of inception</u> [of the AIG Policy] to relinquish the policy to Coventry," the District Court should have looked to Ms. Malkin's intent to transfer the AIG Policy, and found that her intent did not render the Policy void.

Defendants' argument fails. <u>Price Dawe</u> holds that "the insured's subjective intent for procuring a life insurance policy is not the relevant inquiry." 28 A.3d at 1076. Rather, the relevant inquiry "is who procured the policy and whether or not that person meets the insurable interest requirements." <u>Id.</u> And, as discussed below, the record shows that Ms. Malkin did not procure the AIG Policy.

Other courts applying <u>Price Dawe</u> have also rejected the argument Defendants make here. <u>See</u> <u>U.S. Bank Nat'l Ass'n v. Sun Life Assurance Co. of Can.</u> ("<u>Van de Wetering</u>"), No. CV14-4703 (SJF)(ARL), 2016 WL 8116141, at

14

*18 (E.D.N.Y. Aug. 30, 2016), report and recommendation adopted, No. 14-CV-4703 (SJF)(ARL), 2017 WL 347449 (E.D.N.Y. Jan. 24, 2017) (rejecting argument that a policy lacks an insurable interest under Price Dawe when the insured "entered into an express contract with Coventry to sell the Policy"); Sun Life Assurance Co. Can. v. U.S. Bank Nat'l Ass'n ("Sol"), 369 F. Supp. 3d 601, 615 (D. Del. 2019) (rejecting defendants' argument that the policy did not qualify as an illegal STOLI policy because "the parties had no prior arrangement" for any of them to acquire the policy), reconsideration denied, C.A. No. 17-75-LPS, 2019 WL 2052352 (D. Del. May 9, 2019), appeal docketed, No. 20-1271 (3d Cir. Feb. 7, 2020).

In sum, the evidence Defendants point to (in an attempt to show Ms. Malkin intended to sell the AIG Policy on the open market) is, under Delaware law, irrelevant to the inquiry of whether the policy had or lacked an insurable interest at its inception.

3. Ms. Malkin Did Not Procure the AIG Policy

Instead, to conduct a proper inquiry into who procured the policy, we look at who pays the premiums and whether that person meets the insurable interest requirements. See Price Dawe, 28 A.3d at 1075–76. Defendants say the District Court erred by finding, as a matter of law, that Coventry, not the Malkins, paid the premiums on the AIG Policy. They say that in premium financing transactions like

15

the one here, the insured will eventually pay the premiums. Because premium financing transactions can be perfectly legal, Defendants say, the court never addressed the critical question of whether Ms. Malkin's decision to relinquish the AIG Policy in 2008 established that an arrangement for Coventry to take ownership of the policy (and thus pay premiums) existed at the time of the Policy's inception in 2006. In other words, Defendants argue the District Court should have analyzed whether the evidence established that at the inception of the AIG Policy there was a "pre-negotiated arrangement" between Ms. Malkin and Coventry under which Malkin would later transfer the policy to Coventry.

This argument fails as well. Price Dawe explains that whether § 2704 "confer[s] upon a trustee an insurable interest in the life of the individual insured who established the trust" depends on whether "the insured intends to transfer the beneficial interest in the trust to a third-party investor with no insurable interest." 28 A.3d at 1076. If, for example, Ms. Malkin procured a policy and named her own trust as the owner and beneficiary of that validly procured life insurance policy, the trustee has an insurable interest. See id. at 1076–77. If Ms. Malkin "created and initially funded" a trust for the purpose of procuring life insurance on her own life, then the trustee of that trust also has an insurable interest. Id. at 1077 (emphasis omitted). The key in both scenarios is that either the person who is insured or the trustee must purchase the policy for lawful insurance purposes and

16

not as a cover for a wagering contract.  The transaction cannot be set up to accomplish "indirectly" what Delaware law prohibits parties from doing directly. Id. at 1078.

We do not read Price Dawe to say that a policy lacks an insurable interest only when there is a pre-negotiated agreement to immediately transfer ownership. Rather, Price Dawe takes a broader view.  It "requires courts to scrutinize the circumstances under which the policy was issued" and whether those circumstances show the person who is insured "purchase[d] the policy for lawful insurance purposes."  Price Dawe, 28 A.3d at 1076, 1078.  Whether there was a pre-negotiated agreement between the person who is insured and the trust is just one circumstance the Supreme Court of Delaware specifically addressed and found to fail for lack of an insurable interest.  Id. at 1078; see also Sol, 369 F. Supp. 3d at 615 & n.10 (rejecting defendant's interpretation of Price Dawe, which said that the policy could not be a STOLI policy because the parties involved in procuring the policy "had no prior arrangement" for them to acquire the policy); Van de Wetering, 2016 WL 8116141, at *18 (holding that Price Dawe "does not require that [the insurer] show that [the insured] had entered into an express contract with Coventry to sell the Policy to hold that the Policy was an illegal wagering contract").  Therefore the existence of an agreement to immediately transfer

ownership is not dispositive of whether there is an insurable interest in the AIG Policy.

In considering the circumstances under which the AIG Policy was issued, we believe those circumstances do not show Ms. Malkin, Simba, and Coventry intended to purchase the Policy for lawful insurance purposes. Price Dawe, 28 A.3d at 1076, 1078. Rather, the arrangement appears to accomplish "indirectly" what Delaware law prohibits doing directly to create an illegal wagering contract by which Coventry gambled on Ms. Malkin's life and from which Coventry and Simba profited. Id. at 1078.

As the District Court correctly found, the record shows Ms. Malkin never paid any premiums on the AIG Policy.[10] The loan application for the AIG Policy

---

[10] Defendants argue the District Court improperly relied on the unsworn statement of Mr. Bryan to support its conclusion that Ms. Malkin did not pay premiums, because an unsworn statement is "not competent evidence." See 28 U.S.C. § 1746 (explaining that any rule that requires an affidavit, such as Rule 56(e), can be satisfied by an "unsworn declaration . . . or statement, in writing . . . as true under penalty of perjury"). But this record contains ample other evidence to support the District Court's finding that Ms. Malkin did not pay premiums. Peter Shapiro, Simba's director of operations, confirmed at his deposition that Simba's process was to "allow one or more of these financial institutions to enjoy the benefits of a life insurance policy in exchange for . . . them paying all the premiums and expenses associated with it." R. Doc. 135-6 at 21; see also id. at 63 (confirming the Malkins' transaction followed this process). Mr. Shapiro explained that some amount had to be paid towards the premiums "to get the policy in force," but "[m]ost clients don't want to . . . have any out-of-pocket expense" so Simba would send the client a check and get reimbursed from the funder. Id. at 39–40. Murray Roffeld, an insurance broker at Simba, also testified that Simba's transactions "[c]ost the client no money at all" because the bank financing the loan paid the premiums. R. Doc. 135-8 at 5, 11. Mr. Bryan confirmed this was the process in his deposition as well, and conceded that Simba's marketing materials advertised "[n]o obligations or out of pocket expenses when engaging in a life insurance capacity transaction." See R. Doc. 135-4 at 28, 34, 41, 82–83 (confirming that, consistent with the foregoing, Ms. Malkin had "[n]o out of pocket cost"). In the deal Simba offered Ms. Malkin, a financial institution provided a loan for the premiums to be paid and Ms.

18

may have listed the Trust as the premium payor, but Coventry paid the initial premiums to AIG on the Policy and Berkshire paid the remaining premiums after the Policy was sold.  Neither the Malkins nor the trustee procured the AIG Policy.  Rather, these circumstances show Simba and Coventry worked together to use the Malkins "to do indirectly" what Delaware law prohibited them from doing directly.  See Price Dawe, 28 A.3d at 1075, 1078.  There is no insurable interest in the AIG Policy and it is therefore illegal and void under § 2704(a).

4.  Defendants' Arguments About Disputed Facts and *Sun Life* Do Not Entitle Them to Relief

Defendants' last argument is that the District Court relied on disputed facts and treated Sun Life as binding in order to grant summary judgment to the Estate.

We begin with the facts Defendants claim are disputed.  First, Defendants say the District Court improperly attributed control of the AIG Policy transaction to "Coventry."  They say the attribution to Coventry is factually inaccurate because Coventry Capital dictated the deal and Coventry First ultimately purchased the Policy and they are two separate legal entities.  Second, Defendants say Ms. Malkin played an active role in the transaction, which refutes evidence that any

Malkin could "see and decide over the course of those years what [she] wanted to do."  See id. at 34.  After those two years, a client could take over the policy and, going forward, pay the premiums.  R. Doc. 135-6 at 45.  But no Simba client, including Ms. Malkin, chose to take over the premium payments once the loan from the financial institution became due.  See id.  This evidence supports the finding that the only entities that paid any money for life insurance policies procured through Simba, including the AIG Policy here, were the funders.

19

Coventry entity directed the transaction. Third, Defendants say the court improperly characterized the power of attorney granted to Coventry as broad, rather than limited.

Defendants' version of the facts is meant to support their argument that Coventry did not control the deal or merely use Ms. Malkin as "an instrumentality" to obtain the AIG Policy. See Price Dawe, 28 A.3d at 1074. However, Defendants seek an impermissible end-run around the "key distinction" of an illegal STOLI policy. Id. Again, at the inception of the policy, a third party cannot use the insured as "a means or instrumentality to procure a policy that, when issued, would otherwise lack an insurable interest." Id. Price Dawe instructs that, to determine who procured or effected a policy, "we look at who pays the premiums." Id. at 1075. Because Ms. Malkin did not pay the premiums, whether the facts Defendants rely on are disputed or not is irrelevant to our holding.

Second, Defendants reiterate that Sun Life is not binding and argue the District Court should not have treated Sun Life as even persuasive authority. This is so, they say, because Sun Life did not address evidence showing Ms. Malkin intended to sell the AIG Policy on the open market. We agree that Sun Life is not binding precedent. To the extent the District Court relied on Sun Life as persuasive authority, and even if Ms. Malkin's intent was relevant to the inquiry (it is not), the Sun Life court did address this argument and found, correctly, that the

20

inquiry turns on who procured or effected the policy. <u>Sun Life</u>, 2016 WL 161598, at *15, *18 ("The question must always be who procured the policy at issue . . . .").

\*     \*     \*

In sum, the District Court properly held that the AIG Policy is an illegal STOLI policy that lacks an insurable interest. It is therefore void under Delaware law.

B.     THE RESOLUTION OF WHETHER THE DISTRICT COURT ERRED BY DISMISSING DEFENDANTS' UCC DEFENSES INVOLVES AN UNANSWERED QUESTION OF DELAWARE LAW

Defendants raised two defenses based on sections of Delaware's UCC before the District Court. Both Berkshire and Wells Fargo rely on Delaware Code Annotated Title 6, § 8-502 to assert a bona fide purchaser defense. Wells Fargo also claims it was not liable and entitled to summary judgment based on its limited role as a securities intermediary under Delaware Code Annotated Title 6, § 8-115.

The District Court held that both defenses failed as a matter of law. With regard to the bona fide purchaser defense, the court noted that the fact that the AIG Policy "is void <u>ab initio</u> under Delaware law means that [Defendants] are very likely <u>not</u> bona fide purchasers." The court noted, however, that it "need not wade into such complexity" because § 2704 "takes no notice of the UCC, and makes no exception for bona fide purchasers." And even more importantly, the District Court said, allowing Defendants to assert a bona fide purchaser defense would

21

"gut" the purpose and effectiveness of § 2704.  With regard to Wells Fargo's securities intermediary defense, the District Court acknowledged that "Wells Fargo would appear to have no liability under [§ 2704](b)," but ultimately found that the securities intermediary defense failed as a matter of law for the same reasons as the bona fide purchaser defense.

On appeal Defendants claim the District Court (1) failed to read the UCC in conjunction with § 2704; (2) failed to apply the UCC as the later-enacted statute; and (3) misread Price Dawe as precluding application of the UCC.  We have found no precedential authority on whether Defendants can assert their UCC-based defenses in this context.  And we prefer not to guess in the first instance about whether there is an irreconcilable conflict between the UCC and § 2704, or whether Price Dawe precludes the application of the UCC.  See In re Cassell, 688 F.3d 1291, 1300 (11th Cir. 2012) (certifying question to the state supreme court because "guessing is not our only option"), certified question answered sub nom. Silliman v. Cassell, 738 S.E.2d 606 (Ga. 2013); Toomey v. Wachovia Ins. Servs., Inc., 450 F.3d 1225, 1231 (11th Cir. 2006) (per curiam) (certifying question to state supreme court when there was no state authority on point), certified question answered, 994 So. 2d 980 (Fla. 2008).  "When there is substantial doubt about the correct answer to a dispositive question of state law, a better option is to certify the

22

question to the state supreme court." Cassell, 688 F.3d at 1300.  Therefore we believe certification of this question is the preferred course.

C.    BERKSHIRE MAY BE ENTITLED TO THE PREMIUMS IT PAID AND THE DISTRICT COURT ERRED BY STRIKING ITS MISREPRESENTATION COUNTERCLAIMS

Berkshire argues the District Court erred in denying its counterclaims primarily on the ground that such claims are abrogated by § 2704(b) and Delaware public policy.  Berkshire asserted three counterclaims: one for unjust enrichment and two for fraudulent and negligent misrepresentations.

The District Court dismissed and struck Berkshire's counterclaims.  In an oral order, the court explained it was dismissing the unjust enrichment claim because Delaware law did not support an equitable cause of action.  The court also denied Berkshire's fraudulent and negligent misrepresentation claims because Berkshire did not rely on any representations made by Ms. Malkin.  We will discuss each claim in turn.

1. Unjust Enrichment

Ordinarily, parties to an illegal contract do not have a remedy against one another.  See Della Corp. v. Diamond, 210 A.2d 847, 849 (Del. 1965).  However, federal courts applying Delaware law have "consistently permitted requests for the return of premium payments."  See Snyder, 2021 WL 106919, at *8 (collecting cases).  One Delaware trial court recently viewed the return of premium payments

23

on a STOLI policy as a request for restitution. Brighthouse Life Ins. Co. v.

Geronta Funding, No. N18C-04-028 DCS, 2019 WL 8198323, at *4 (Del. Super.

Ct. Mar. 4, 2019) (rejecting a theory of rescission for the repayment of paid

premiums where the contract was void). Even more recently, a magistrate judge in

the United States District Court for the District of Delaware has done the same.

See Snyder, 2021 WL 106919, at *7 (applying Brighthouse and "view[ing] the

counterclaim as essentially a request for restitution"). Other courts applying

Delaware law have allowed the return of premium payments without opining on

what equitable theory they were using to reach their finding. See, e.g., Van de

Wetering, 2016 WL 8116141, at *19.

Yet the Supreme Court of Delaware has not yet offered an opinion on

whether and under what circumstances premiums may be recovered when a policy

is found to be void under § 2704. Because the resolution of this appeal involves a

question of Delaware law unanswered by precedent, we also respectfully certify

this issue, as set forth below, to the Supreme Court of Delaware. Toomey, 450

F.3d at 1231.

2. Fraudulent and Negligent Misrepresentation

Berkshire also claims the District Court erred by striking its

misrepresentation counterclaims. These claims are based on alleged

misrepresentations Ms. Malkin made in the application for the AIG Policy. In its

24

response, the Estate argues, among other things, that it showed as a matter of undisputed fact that Berkshire couldn't establish the elements of these claims. However, because the Estate moved to dismiss these counterclaims under Federal Rule of Civil Procedure 12(b)(6), the District Court erred by granting the motion based on evidence attached to the motion. This is because that evidence extends beyond the legal sufficiency of the factual allegations in Berkshire's counterclaims, which is all the court considers at the Rule 12(b)(6) stage.

The District Court heard the Estate's motion to dismiss from an unusual procedural standpoint. Berkshire asserted these counterclaims in January 2019, after discovery closed and after summary judgment had been filed, because the complaint was amended to add it as a party late in the case.[11] The Estate filed its motion to dismiss in February 2019, when its motion for summary judgment—and the supporting evidence—had been pending for five months. The District Court granted the Estate's motion for summary judgment in March 2019, but declined to address Berkshire's counterclaims in that order. Instead it held a hearing on the Estate's motion to dismiss, heard the parties' arguments, and "[f]or the reasons stated at the Motion Hearing," summarily dismissed Berkshire's counterclaims.

---

[11] The amended complaint was filed in July 2018. Berkshire filed its summary judgment motion before it filed an answer to the complaint because it was simultaneously moving to dismiss the amended complaint under Rule 12(b)(6).

Berkshire's counterclaim for fraudulent misrepresentation requires showing: (1) a false representation, usually one of fact, made by Ms. Malkin; (2) Malkin's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce Berkshire to act or to refrain from acting; (4) Berkshire took action or failed to take action in justifiable reliance upon the representation; and (5) damage to Berkshire as a result of such reliance. Zirn v. VLI Corp., 681 A.2d 1050, 1060–61 (Del. 1996). A claim for negligent misrepresentation has the same elements, with the exception of the second "knowledge" element. Id. at 1061. The Estate primarily argued before the District Court that Berkshire could not show the justifiable reliance element. The Estate attached Berkshire's Rule 30(b)(6) deposition to its motion to dismiss to show that the only representations Berkshire relied on were those made by Coventry, not Ms. Malkin. Berkshire's corporate designee testified to the following facts:

- Berkshire did not engage anyone to conduct due diligence with regard to any of the policies acquired under the purchase agreement with Coventry;
- Berkshire did not review any of the materials in the policy files before it entered into the purchase agreement with Coventry;
- Berkshire did not obtain the policy files for any of the bundled policies, including the Malkin file—rather, the policy files were "all held and retained by Coventry";
- No one from Berkshire has ever reviewed any files from the policies purchased from Coventry; and
- Berkshire did not do any due diligence into Coventry's representation in the purchase agreement that none of the policies in the bundle

26

> "could reasonably be expected to have, individually or in the aggregate, a material adverse effect" on Berkshire—it "simply relied on their representation."

The District Court heard these arguments and asked the Estate whether the purchase agreement was with Ms. Malkin.  The Estate confirmed she "had no connection with that purchase agreement at all."  The court then granted the Estate's motion to dismiss based on the fact that Berkshire's agreement was with Coventry, not Ms. Malkin.  In sum, the Estate's arguments hinged on the corporate designee's deposition testimony, and it is clear that the District Court's dismissal of these claims relied on this document.

In this appeal, Berkshire claims it need not proffer the facts of its claim because the motion to dismiss was decided under Rule 12(b)(6).  See Berkshire Hathaway's Reply Br. at 48 ("[A]t the motion-to-dismiss stage, Berkshire is required only to plausibly plead the elements of these claims, which it did.").  Berkshire is correct that generally, for purposes of Rule 12(b)(6) review, a court may not look beyond the pleadings, United States ex rel. Osheroff v. Humana Inc., 776 F.3d 805, 811 (11th Cir. 2015), and must accept the allegations in the complaint (or here, in the counterclaim) as true, see Chaparro v. Carnival Corp., 693 F.3d 1333, 1337 (11th Cir. 2012) (per curiam).  The District Court may consider matters outside the pleadings in a Rule 12(b)(6) motion only by converting it into a Rule 56 summary judgment motion.  Trustmark Ins. Co. v.

ESLU, Inc., 299 F.3d 1265, 1267 (11th Cir. 2002). But if the District Court converts the motion, it is required to notify the parties and give them 10 days in which to supplement the record. Id. The District Court did not provide such notice here. And, because the Estate's arguments hinged on evidence outside the scope of the pleadings, the District Court erred in considering matters beyond the face of the complaint without complying with Rule 56.

We vacate the dismissal of Berkshire's misrepresentation claims and, upon the return of this case following certification of questions to the Supreme Court of Delaware, we remand to the District Court for proceedings consistent with this opinion.

D.    WE RESERVE JUDGMENT ON THE QUESTION OF WHETHER THE DISTRICT COURT PROPERLY CALCULATED ANY PREJUDGMENT INTEREST TO WHICH THE ESTATE IS ENTITLED

The Estate argues that under Delaware law, liability on a legal claim accrues at the moment the plaintiff has a right to bring that claim. It says that date is October 29, 2014, when AIG paid out $4,013,976.47 to Berkshire on the AIG Policy. The District Court, however, found the Estate's argument unpersuasive because the Estate "put forward no evidence that either of the Defendants was aware on [October 29, 2014] that the [AIG] Policy here was an illegal STOLI policy." Instead, the court found prejudgment interest should run from October 31,

28

2017, when the Estate "formally demanded payment" by serving Wells Fargo with the complaint.

We reserve judgment on this issue because whether the Estate is entitled to any AIG Policy proceeds (and as a result, prejudgment interest on those proceeds) depends on the Supreme Court of Delaware's answers to the questions certified below.

\*        \*        \*

In conclusion, we affirm the District Court's finding that the AIG Policy is void under § 2704(a).  We vacate the District Court's dismissal of Berkshire's misrepresentation claims and, upon the return of this case following certification of questions to the Supreme Court of Delaware, we remand to the District Court for proceedings consistent with this opinion.  However, because we certify two questions to the Supreme Court of Delaware to guide our decision regarding whether the District Court erred by dismissing Defendants' UCC defenses and Berkshire's unjust enrichment claim, we defer decision on those issues, as well as the issue of whether the District Court properly calculated any prejudgment interest owed to the Estate.  Further, because the ultimate outcome of this case will turn on

those decisions, this appeal is **STAYED** pending certification of those issues to the Supreme Court of Delaware.[12]

## IV.    CERTIFIED QUESTIONS

Suits to recover for violations of § 2704(a) have recently become more prevalent in this Court and others.  We are aware that the Supreme Court of Delaware accepted certification of questions of law related to a STOLI policy as recently as March of this year.  Yet to our knowledge no Delaware court has had the occasion to answer the question of whether an entity that purchases a STOLI policy and holds the proceeds paid out on that policy following the insured's death can assert a UCC-based defense to a § 2704(b) claim to recover those proceeds. Further, while federal courts consistently recognize that the party who paid premiums on a policy that is void under § 2704(a) is entitled to recover such premiums, the legal theory for recovery is still developing in Delaware trial courts and the Supreme Court of Delaware has yet to express an opinion.  These issues are likely to arise again given the widespread use of STOLI schemes, and the answers to these questions will have far-reaching effects on the parties to these schemes.  Therefore we offer the Supreme Court of Delaware "the opportunity to interpret or change existing law" by respectfully asking it to resolve these two

---

[12] We also grant Defendants' motion to strike portions of the Estate's reply brief as an improper sur-reply.

30

issues.  Burger v. Time Ins. Co., 115 F.3d 880, 881–82 (11th Cir. 1997) (per curiam), certified question accepted, 700 So. 2d 688 (Fla. 1997), and certified question answered, 712 So. 2d 389 (Fla. 1998).

We defer our decision on the issues related to the UCC-based defenses and unjust enrichment claim in this case pending certification and decision of the following questions to the Supreme Court of Delaware for disposition in accordance with Delaware Constitution, Art. IV, § 11(8) and Delaware Supreme Court Rule 41(a)(ii).

*Question One:*    If an insurance contract is void under Del. Code Ann. tit. 18, § 2704(a) and PHL Variable Insurance Co. v. Price Dawe 2006 Insurance Trust, ex rel. Christiana Bank & Trust Co., 28 A.3d 1059, 1073 (Del. 2011), is the party being sued under § 2704(b), as a third-party purchaser of the contract and holder of the proceeds, entitled to assert either a bona fide purchaser defense under Del. Code Ann. tit. 6, § 8-502, or a securities intermediary defense under Del. Code Ann. tit. 6, § 8-115?

*Question Two:*    If an insurance contract is void under Del. Code Ann. tit. 18, § 2704(a) and PHL Variable Insurance Co. v. Price Dawe 2006 Insurance Trust, ex rel. Christiana Bank & Trust Co., 28 A.3d 1059, 1073 (Del. 2011), can the party that is being sued under § 2704(b) recover premiums it paid on the void contract?

We stress that "our statement of the questions is not designed to limit the inquiry" of the Supreme Court of Delaware.  Cassell, 688 F.3d at 1301 (quotation marks omitted and alteration adopted).  Rather,

> [t]he particular phrasing used in the certified question is not to restrict the [Delaware] Supreme Court's consideration of the problems involved and the issues as

31

the Supreme Court perceives them to be in its analysis of the record certified in this case.  This latitude extends to the [Delaware] Supreme Court's restatement of the issue or issues and the manner in which the answers are to be given, whether as a comprehensive whole or in subordinate or even contingent parts.

Id. (quotation marks omitted).  The entire record on appeal in this case, including copies of the parties' briefs, is transmitted along with this certification.

**QUESTIONS CERTIFIED; APPEAL STAYED PENDING CERTIFICATION AND DECISION BY THE DELAWARE SUPREME COURT.**